**Arnold R. VASBINDER,**
**Plaintiff–Appellant,**
**Cross–Appellee,**

v.

**Gordon AMBACH, Basil Y. Scott, and Richard M. Switzer, Defendants,**

**Basil Y. Scott and Richard M. Switzer,**
**Defendants–Appellees,**
**Cross–Appellants.**

**Nos. 531, 537, Dockets 90–7299, 90–7313.**

United States Court of Appeals,
Second Circuit.

Argued Nov. 5, 1990.

Decided Feb. 28, 1991.

Jules L. Smith, Rochester, N.Y. (Steven V. Modica, Blitman & King, Rochester, N.Y., on the brief), for plaintiff-appellant-cross-appellee.

Darren O'Connor, Asst. Atty. Gen., Albany, N.Y. (Robert Abrams, Atty. Gen. of the State of N.Y., Peter H. Schiff, Deputy Sol. Gen., Michael S. Buskus, Judith I. Ratner, Asst. Attys. Gen., Albany, N.Y., on the brief), for defendants-appellees-cross-appellants.

Before KEARSE, MAHONEY, and McLAUGHLIN, Circuit Judges.

KEARSE, Circuit Judge:

Plaintiff Arnold R. Vasbinder appeals from so much of a judgment entered in the United States District Court for the Northern District of New York after a jury trial before Thomas J. McAvoy, *Judge*, as dismissed, notwithstanding the jury's verdict, his claim under 42 U.S.C. § 1983 (1988) seeking punitive damages from defendants Basil Y. Scott and Richard M. Switzer for retaliation against him for exercising his rights under the First Amendment to the Constitution. Scott and Switzer cross-appeal from so much of the judgment as awarded Vasbinder compensatory damages totaling $82,529.49, contending that the district court erred in denying their motions for a directed verdict and judgment notwithstanding the verdict ("n.o.v.") on the ground of qualified immunity or insufficiency of the evidence as to liability. For the reasons below, we affirm so much of

the judgment as awarded Vasbinder compensatory damages; we conclude that the court erred in setting aside the jury's verdict in favor of Vasbinder on the issue of punitive damages; and we remand for further proceedings on the latter issue.

## I. BACKGROUND

The present controversy arises out of Vasbinder's employment in the New York State Department of Education's Office of Vocational Rehabilitation ("OVR"), and his reporting to the Federal Bureau of Investigation ("FBI") of his suspicions of wrongdoing in a federally funded program overseen by OVR. Scott was the Deputy Commissioner for Vocational Rehabilitation who managed the operations of OVR; Switzer, the Assistant Commissioner, was Vasbinder's immediate supervisor. As set forth in greater detail below, though Vasbinder had previously enjoyed consistently high job performance ratings, immediately following revelation of his contact with the FBI he was given low ratings and was soon demoted. The evidence adduced at trial, viewed in the light most favorable to Vasbinder, showed the following.

### A. The Events

#### 1. Treatment of Vasbinder Before His FBI Contact

Vasbinder had devoted his entire professional career of 20–odd years to improving employment opportunities for handicapped persons. After working for the Buffalo City School District for several years teaching handicapped high school students, he had been hired by OVR in 1969 as a vocational rehabilitation counselor. In this position, Vasbinder counseled the handicapped and helped to place them in productive employment. He was promoted twice over the next ten years. He first became a senior vocational rehabilitation counselor; then in November 1979, he received a provisional appointment as statewide coordinator of placement services ("statewide coordinator"). His appointment as statewide coordinator was made permanent on September 23, 1982. This permanent appointment was subject, under the New York

Civil Service Law, to a "flexible probationary period" lasting at least 12, but not more than 52, weeks, see N.Y.Civ.Serv. Law, Rules and Regulations § 4.5(a)(2) (McKinney 1983 & 1991 Supp.); Scott informed Vasbinder that his probation would last only the minimum 12–week period.

Until November 1982, Vasbinder was consistently given high ratings on his performance as statewide coordinator. While noting room for improvement in interpersonal relations, the evaluations by Scott and Switzer rated him "highly effective" and "outstanding." In the evaluation covering the period October 1, 1981, to April 30, 1982, for example, Vasbinder's performance was rated as "outstanding," a rating defined as follows:

> The employee's performance is clearly exceptional in comparison with performance standards specified in the performance program. The performance consistently exceeds the requirements for all the tasks, assignments or activities and the objectives which were to be accomplished during the evaluation period. The employee can be relied upon to perform the most difficult assignments and has made exceptional contributions to the work of the unit.

During Vasbinder's tenure as provisional and permanent statewide coordinator, the number of OVR clients placed in employment increased significantly. Thus, the 1982–83 Annual Report of the Educational Department stated that in 1982, OVR placed 10,252 disabled persons in gainful employment, an increase of 12.5 percent over the previous year's total. These gains were made in the face of cutbacks in staffing and a nationwide trend of decreasing placements. The report also noted that "[t]he three-year trend shows a steady improvement" in successful placements. That three-year period had begun soon after Vasbinder's provisional appointment as statewide coordinator.

#### 2. The Report to the FBI

On May 24–25, 1982, Vasbinder represented OVR in a joint state-and-federal review of a grant given by a federally funded

program called Projects with Industry ("Project"). The review was conducted to audit the use of Project moneys given to the International Center for the Disabled ("ICD"), a rehabilitation facility that accepted client referrals from OVR. In the course of this review, Vasbinder discovered several practices that appeared to him to be improper, if not unlawful. It appeared that there were overcharges and duplicative billing and that an effort had been made to code the billing in a way that would mask the improprieties. In particular, Vasbinder testified that in many of the files he examined, there appeared three vouchers for placement of one individual; in addition, the amount of each voucher, $900 +, was higher than OVR would usually pay; and though the vouchers were coded as requests for reimbursement for training rather than for placement, one of the recipient organizations was not devoted to training the handicapped but was merely an employment agency. Vasbinder was also aware that both the founder and the director of that employment agency had long-time personal relationships with Switzer; he had heard Switzer refer to one of them frequently as his "protege."

Vasbinder immediately showed his findings to OVR's downstate regional director Mary Brady, in whose territory ICD was located. Brady, a grade 32 employee (several grades higher than Vasbinder) who also reported to Switzer, instantly recognized the apparent improprieties. However, no corrective action was forthcoming.

Vasbinder was aware that some years earlier, the FBI and other law enforcement entities had investigated a kickback scheme involving OVR, resulting in the conviction and imprisonment of an OVR employee and at least one private vendor. He was also aware that another OVR employee had been disciplined for reporting improprieties at ICD. As a result, Vasbinder feared that he had "walked into a hornets' nest and that [he] was going to get stung." He testified:

> I was concerned that I would be in trouble for reporting a problem of moneys that involved the bosses' [sic] friends. I was concerned that I would be reporting a problem regarding a politically powerful rehabilitation facility. I knew that another OVR employee had been transferred after raising concerns about fee payments at ICD for other things other than placement.

Accordingly, both fearful of being personally implicated in a coverup of the apparent improprieties and concerned that his supervisors might be involved in the wrongdoing because of a relationship with the private facilities involved, in August 1982 Vasbinder contacted the FBI. The FBI thereupon commenced an investigation.

In late October 1982, one of the FBI agents assigned to the investigation instructed Vasbinder to inform Scott of the possible improprieties Vasbinder had discovered during the ICD audit. Vasbinder did so and disclosed that he had reported his discoveries to the FBI. Following this meeting, Scott ordered an OVR audit of the Project program. The OVR auditor discovered other problems with respect to rates charged and services rendered by private facilities, and these discoveries resulted in OVR's changing some of its procedures and requesting credits from several such facilities. The audit did not turn up problems of the sort found by Vasbinder; according to Vasbinder, however, the auditor failed to look at certain files, called to the auditor's attention, that would have disclosed these problems.

### 3. Treatment of Vasbinder After Revelation of His FBI Contact

After Vasbinder informed Scott in late October 1982 that he had spoken to the FBI, his evaluations by Scott and Switzer deteriorated dramatically. Though all of their prior ratings of Vasbinder's job performance had been very high (the then-most recent evaluation rated his performance "exceptional," "consistently exceed[ing] the requirements for all ... tasks," making "exceptional contributions"), and though they had just promoted him to permanent statewide coordinator in September, their review dated November 22, 1982, rated his job performance as barely effective.

In December 1982, Scott and Switzer stripped Vasbinder of his duties with respect to the placement plans for the various OVR district offices, *i.e.,* his most significant duties as statewide coordinator. In January 1983, Switzer extended Vasbinder's probationary period from the 12-week minimum to the maximum period allowable, 52 weeks. In a January 28, 1983 probationary evaluation report, Vasbinder was rated just "average" in most categories and was rated below average in another. He was rated "satisfactory" only in attendance. Scott refused to discuss the evaluation with Vasbinder. Vasbinder testified that in a meeting on March 23, 1983, Scott said

> he had been very upset that I'd gone to the FBI and that he knew that Mr. Switzer and Mr. Ambach, the Commissioner of Education, were very upset that I had gone to the FBI, that they would not ever be able to trust me again, that I should look for other employment. They wouldn't be able to trust me again because I had gone to the FBI. That this had created a lot of problems for him. He now has to write a report to Commissioner Ambach and the US Attorney.

Scott admitted in his testimony that he had "expressed concern, I guess would be the word I would use," to Vasbinder about Vasbinder's decision to contact the FBI.

In the spring of 1983, the FBI took the results of its investigation to the United States Attorney for the Northern District of New York, who determined that there was not a prosecutable case. One of the agents testified at trial that this determination did not mean that no wrongdoing had been found, but only that the prosecutors' assessment was that "they didn't feel they had a case that they could have successful prosecution on." On June 1, 1983, Scott received a letter from the FBI stating that the United States Attorney's office had "advised that based on the results of the investigation provided to [it], there is no indication of a violation of law which would merit federal prosecution." Nine days later, Vasbinder was terminated from his position as statewide coordinator.

The termination notice stated that Vasbinder had not satisfactorily completed his probationary period (which was not scheduled to end for several months) and that, therefore, he would be returned to his position of senior vocational rehabilitation counselor (a position from which, under the New York Civil Service Law, he could not be terminated except for cause, *see* N.Y. Civ.Serv.Law § 75). This constituted a demotion from grade 25 to grade 22 and resulted in a decrease in salary.

**B.** *The Proceedings Below*

Vasbinder commenced the present action in 1986 against Scott and Switzer, along with others who are no longer parties, alleging principally that Scott and Switzer violated his civil rights by retaliating against him for exercising his First Amendment rights in reporting his suspicions of unlawful practices to the FBI. The complaint alleged that the retaliation took the form of giving Vasbinder a false and damaging performance review, systematically stripping him of his responsibilities, and finally demoting him from his position as statewide coordinator of placement services.

At trial, Vasbinder presented the above version of the events. As to damages, he testified, *inter alia,* that in addition to the trauma caused him by the events leading to his demotion, after the demotion he had suffered seven years of pain and sleepless nights. His former colleagues essentially ostracized him and refused to communicate with him; he felt his reputation had been destroyed.

At the close of Vasbinder's case, Scott and Switzer moved for a directed verdict on the grounds, *inter alia,* that Vasbinder had failed to show that he was demoted because of his contact with the FBI, and that they were entitled to prevail on the ground of qualified immunity because "according to the balancing test that we have here and the prior case law, there was no way that objectively either Dr. Scott or Dr. Switzer could have known, could have known about these types of issues at the time."

The district court denied the motion. It found that Vasbinder had introduced sufficient evidence to present a jury question as to causation. The court rejected defendants' qualified immunity defense on the ground that Vasbinder had exercised a clearly-established constitutional right and that an objective employer would have known that retaliation would violate that right.

In the defense case, Scott and Switzer testified that Vasbinder had not been demoted because of his contact with the FBI. Rather, Scott testified that Vasbinder was demoted because Scott "had come to the conclusion that [Vasbinder] was lacking the ability to work effectively and in a positive way with the other people with whom he had to work ...; that there was no way that we could run a successful coordinated placement operation with Mr. Vasbinder in that position."

Switzer testified that the fact that Vasbinder had contacted the FBI "[h]ad absolutely nothing to do with my decision to downgrade him." Rather, Vasbinder had been demoted because Switzer "felt he was incompetent of [sic] the job he was doing." Switzer identified some 10 memoranda from OVR employees complaining of Vasbinder's approach to field audits of placement operations. Switzer testified that the complaints were that Vasbinder was "too rigid" because he was "following the [OVR statewide] plan to the letter." There were also complaints that Vasbinder's auditing style was too confrontational. Most of these complaints predated Vasbinder's September 23, 1982 promotion.

Both Scott and Switzer testified, contrary to Vasbinder's testimony, that they did not know of his contact with the FBI until February 1983, months after they started giving him unsatisfactory evaluations and relieving him of his responsibilities. Switzer, for example, testified, "I thought he was incompetent before I found out about the FBI, and I will stick to that."

After the close of all the evidence, Scott and Switzer renewed their prior motion for a directed verdict and added the contention that even if they were subject to liability

for compensatory damages, punitive damages were, as a matter of law, not warranted. The court generally reserved decision; as to punitive damages, however, it decided to submit to the jury the question of whether, but not in what amount, such damages were warranted.

In response to special interrogatories, the jury credited Vasbinder's version of the events, finding in his favor on all issues. It found that his reporting of suspected unlawful activity to the FBI was a motivating or substantial factor in the decision by Scott and Switzer to remove him from his position as statewide coordinator and that Scott and Switzer would not have removed him from that position if he had not gone to the FBI. The jury found that Vasbinder would have been a grade 25 employee but for the demotion and that he had suffered emotional distress for which he was entitled to recover $50,000. The jury also found that Vasbinder was entitled to an award of punitive damages against both Scott and Switzer.

Defendants moved, pursuant to Fed.R. Civ.P. 50(b), for judgment n.o.v. or, in the alternative, a new trial pursuant to Fed.R. Civ.P. 59. In two orders, dated February 26, 1990 ("Posttrial Order") and April 27, 1990, the court denied both motions insofar as they related to liability and compensatory damages. It ruled that Vasbinder's communication with the FBI was protected activity and that defendants had not carried their burden, under the balancing standard established by *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), of showing that their interests overrode Vasbinder's First Amendment interest. The court adhered to its prior ruling that defendants' qualified immunity defense had no merit.

The court did, however, grant judgment dismissing the claim for punitive damages. It found that punitive damages were unwarranted as a matter of law because

[t]here is no evidence to suggest that defendants were motivated by evil motive or intent or that their conduct involved a reckless or callous disregard of or indifference to plaintiff's constitution-

al rights.... To hold, on this record, that punitive damages were legally warranted would be to equate success on the merits of the underlying cause of action with entitlement to punitive damages.... [D]efendants did not engage in any outrageous conduct to warrant imposing punitive damages ... and no reasonable juror could have concluded otherwise.

Posttrial Order at 4.

The court computed the backpay to which Vasbinder was entitled, on the basis of the jury's finding that he would have been a grade 25 employee, as $32,529.49, and judgment was entered in his favor in that amount, plus $50,000 in damages for his emotional injuries, to be borne equally by Scott and Switzer.

This appeal and cross-appeal followed.

## II. DISCUSSION

In this Court, Scott and Switzer contend that the district court erred in not granting them judgment n.o.v. either on the ground that Vasbinder failed to prove a violation of his First Amendment rights or on the ground that they were entitled to qualified immunity. Vasbinder contends that the court erred in dismissing his claim for punitive damages. For the reasons below, we conclude that the court properly rejected the arguments of Scott and Switzer on liability but erred in dismissing the punitive damages claim.

### A. *The Denial of Judgment n.o.v. as to Liability*

The First Amendment protects speech by public employees that touches on matters of public concern. *See, e.g., Pickering v. Board of Education,* 391 U.S. at 574, 88 S.Ct. at 1737; *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 1687, 75 L.Ed.2d 708 (1983). In *Pickering,* however, "[b]ecause of the enormous variety of fact situations in which critical statements by ... public employees may be thought by their superiors ... to furnish grounds for dismissal," the Court declined to "lay down a general standard against which all such statements may be judged." 391 U.S. at

569, 88 S.Ct. at 1735. Rather it ruled that a balancing test must be used. Under this approach, the burden is on the public employer to show that its interests in the efficient performance of its duties outweigh the employee's speech interest, *see id.* at 568, 88 S.Ct. at 1734; the employer's burden in justifying a particular discharge varies depending upon the nature of the employee's expression, *Connick v. Myers,* 461 U.S. at 150, 103 S.Ct. at 1691; *Giacalone v. Abrams,* 850 F.2d 79, 86 (2d Cir. 1988). An employee's charge of unlawful conduct, for example, is given far greater weight in the balancing exercise than is a complaint as to the fairness of internal office operations. *See Connick v. Myers,* 461 U.S. at 150–54, 103 S.Ct. at 1691–94; *compare Giacalone v. Abrams,* 850 F.2d at 85–86 (complaint about tax law interpretation carries little weight in the balancing process), *with Rookard v. Health and Hospitals Corp.,* 710 F.2d 41, 46 (2d Cir.1983) (complaint of fraudulent and corrupt practices carries great weight).

Defendants' contention that the trial court should have granted their motion for judgment n.o.v. or a directed verdict on the ground that, under the *Pickering* balancing approach, Vasbinder failed to prove a violation of his First Amendment rights is meritless. In reviewing the denial of either motion, we are to apply the same standard that is to be applied by the trial court in ruling on the motion. That standard is that "[b]oth courts must determine whether the evidence, viewed in the light most favorable to the party that secured the verdict, was sufficient to allow a reasonable juror to arrive at the verdict rendered." *Schwimmer v. SONY Corp. of America,* 677 F.2d 946, 952 (2d Cir.), *cert. denied,* 459 U.S. 1007, 103 S.Ct. 362, 74 L.Ed.2d 398 (1982). In making that determination, the court must give deference to all credibility determinations made by the jury and to all reasonable inferences from the evidence that the jury might have drawn in favor of the nonmoving party, *Auwood v. Harry Brandt Booking Office, Inc.,* 850 F.2d 884, 889 (2d Cir.1988); *Bohack Corp. v. Iowa Beef Processors, Inc.,*

715 F.2d 703, 712 (2d Cir.1983); the court may not itself "weigh[ ] the credibility of the witnesses or otherwise consider[ ] the weight of the evidence," *Simblest v. Maynard*, 427 F.2d 1, 4 (2d Cir.1970). Judgment n.o.v. may not be granted unless, within this framework, " 'there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or ... there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him.' " *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.*, 731 F.2d 112, 121–22 (2d Cir.1984) (quoting *Mattivi v. South African Marine Corp., "Huguenot"*, 618 F.2d 163, 168 (2d Cir.1980)). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–51, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986) (same standard applies to review of disposition of motion for directed verdict).

■ In the present case, the court properly rejected any suggestion that the state's efficiency interests outweighed Vasbinder's First Amendment rights. Scott and Switzer conceded that the matters of which Vasbinder spoke, *i.e.*, potential fraud, theft, and misallocation of public funds, were matters of serious public concern. Defendants made little effort to show that Vasbinder's going to the FBI in any way impeded the efficiency of OVR operations. Rather, Scott and Switzer testified that their evaluations and personnel decisions against Vasbinder had, in the words of Switzer, "absolutely nothing to do with" Vasbinder's having gone to the FBI. The court did not err in ruling that defendants failed to show that Vasbinder's exercise of his rights so intruded on OVR operations as to outweigh his right to report suspected wrongdoing to the authorities.

We note in passing that Scott and Switzer have consistently treated the balancing issue here as turning solely on questions of law, not on any question of fact. Thus, they asked the district court to grant them judgment as a matter of law; they did not ask that the jury be instructed on this issue

or that any interrogatories relating to it be submitted to the jury; and they ask this court to direct the entry of judgment in their favor. We can envision cases in which the question of the degree to which the employee's speech could reasonably have been deemed to impede the employer's efficient operation would properly be regarded as a question of fact, to be answered by the jury prior to the court's application of the *Pickering* balancing test. In the present case, however, given the Scott–Switzer defense that Vasbinder's contact with the FBI had nothing to do with their decisions, we agree that there was no such fact issue for this jury.

■ As to the issue of whether the actions of Scott and Switzer were taken in retaliation for Vasbinder's contact with the FBI, the jury plainly accepted Vasbinder's version of the events. Although Scott and Switzer denied that version, the jury was free to disbelieve their testimony, and the evidence discussed in Part I.A. above was ample to permit it to find that Vasbinder revealed his FBI contact in October 1982 and that Scott and Switzer promptly began to give him bad evaluations, soon stripped him of his principal duties, and eventually demoted him, because of his report to the FBI. The evaluations of credibility, together with the inferences to be drawn from the contrast in evaluations before and after Vasbinder's revelation that he had gone to the FBI, were entirely within the province of the jury, and neither the district court nor this Court may overturn them.

In sum, we conclude that the district court properly denied defendants' contention that they were entitled to a directed verdict or judgment n.o.v. on the theory that Vasbinder had failed to establish a violation of his First Amendment rights.

*B. The Rejection of the Qualified Immunity Defense*

■ Scott and Switzer argue that even assuming that Vasbinder established that they unlawfully retaliated against him for exercising his First Amendment rights, they are protected by the doctrine of qualified immunity. That doctrine shields state

officials from liability for damages if their actions did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known," *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982), or even where the rights were clearly established, if it was objectively reasonable for the defendants to believe that their acts did not violate those rights, *see Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987); *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987). The official does not have such immunity where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. at 640, 107 S.Ct. at 3039.

▉ The district court here ruled that the law was clear at the time of the retaliation against Vasbinder, which commenced in November 1982, that defendants' actions would violate his First Amendment rights. We agree. It was established at least as early as 1968 in *Pickering v. Board of Education* that a state employee's good-faith public criticism of the allocation of public funds, was constitutionally protected where the efficiency of the public service the state was performing was not impaired thereby. 391 U.S. at 568, 569–73, 88 S.Ct. at 1734, 1735–37. In *Dobosz v. Walsh,* 892 F.2d 1135, 1141–42 (2d Cir.1989), this Court ruled that it was clearly established in 1981 that a municipal policeman cooperating with the FBI in an investigation of charges against another policeman was exercising his First Amendment right to free speech, and that the defendant who retaliated by suspending him was therefore not entitled to qualified immunity. In *Rookard v. Health & Hospitals Corp.,* 710 F.2d 41, we dealt with another retaliatory demotion occurring in 1981 as a result of complaints of corrupt and wasteful practices, communicated by a municipal hospital's director of nursing to a city official empowered to investigate. Noting that the charges involved a matter of public concern, that Rookard was demoted because of her complaints, and that there was no suggestion that Rookard's complaints, though irritating to her superior, in any way impaired her ability to perform her job or interfered with the operations of the hospital, we ruled that she had so plainly established a prima facie violation of her First Amendment rights that the district court, in a bench trial, could not properly dismiss at the close of Rookard's case.

Defendants rely principally on *Giacalone v. Abrams,* 850 F.2d 79, for the proposition that they could not have been expected to know that retaliation against Vasbinder for going to the FBI would violate his First Amendment rights. Their reliance is misplaced. *Giacalone* involved a state employee who was concerned with the legal interpretation of a provision of federal tax law and was "insisten[t] on having his [legal] conclusions control the handling of [a] tax dispute." *Id.* at 88. Though in the litigation the employee advanced other concerns going to more serious matters of potential impropriety, he had not in fact expressed any such concern prior to being fired. On those facts, we concluded that under the general standard established in *Pickering* and its progeny, it remained objectively reasonable for the state to believe that the termination of such an employee would not violate his First Amendment rights.

*Giacalone* thus is easily distinguishable from the present case, as the matters communicated there were considerably less weighty than Vasbinder's communication as to possible fraud and theft. The present case is not meaningfully distinguishable from *Dobosz* and *Rookard.* Here, as in *Dobosz,* the employee communicated matters of possible malfeasance to the FBI; here, as in *Rookard,* the employee complained about misuse of public funds. In both *Dobosz* and *Rookard,* the retaliatory personnel actions occurred in 1981, and we found that the violation of the plaintiffs' First Amendment rights was clear. The unlawfulness of such retaliation had not become less clear by the time of the Scott–Switzer retaliation against Vasbinder in 1982 and 1983.

## C. *The Dismissal of the Claim for Punitive Damages*

In a § 1983 action, as the trial court here properly instructed the jury, punitive dam-

**1342**

ages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983). In the present case, the court set aside the jury's finding that such an award was warranted, (a) indicating the court's assumption that the threshold levels for the award of compensatory and punitive damages cannot be the same, (b) implying that Vasbinder had shown no more than the minimum necessary to establish his claim for compensatory damages, and (c) concluding that no reasonable juror could have concluded that Scott and Switzer engaged in conduct that was outrageous or in callous disregard of Vasbinder's rights. We disagree with all three of these premises.

First, in *Smith v. Wade*, the Supreme Court expressly rejected the proposition that the deterrence and punitive purposes of punitive damages are served only if the threshold for punitive damages is higher in every case than the underlying standard for liability. The Court noted that at common law there was no difference in the two thresholds, and it perceived no reason to introduce different thresholds in actions brought under § 1983. Although the claim before the Court in *Smith* was one for the use of excessive force, which has a somewhat elevated threshold for the establishment of liability, the Court's general discussion was not limited to that type of claim. Rather, the Court observed that though entitlement to compensatory damages is automatic upon a finding that the plaintiff's rights have been violated, an award of punitive damages is discretionary, reflecting a "moral judgment," *id.* at 52, 103 S.Ct. at 1638, and that the threshold of proof need not be different. *Id.* at 52–55, 103 S.Ct. at 1638–40.

In the present case, we need not decide whether proof that an employer's demotion of an employee because of his report of possible criminal conduct to law enforcement authorities is, without more, the type of conduct that may merit an award of punitive damages, for the jury

was not so instructed. Rather, it was instructed that if it found Vasbinder's constitutional rights had been violated it "must" award him compensatory damages, whereas an award of punitive damages was within its "discretion," and it was given clearly different instructions as to what findings would justify each type of award. Thus, as to liability and compensatory damages, the court instructed the jury, in pertinent part, as follows:

> in order for the plaintiff to prove his [retaliation] claim against the defendants, the plaintiff must establish by a preponderance of the evidence that the acts of speech engaged in by him were a substantial or motivating factor in the defendants' decision to remove the plaintiff from his probationary employment and return him to his former position.
>
> . . . .
>
> If you return a verdict in the plaintiff's favor against either or both of the defendants, you must award him such a sum of money as you believe will fairly and justly compensate him for any injury you find he actually sustained as a direct consequence of the conduct of the defendant.

In connection with punitive damages, in contrast, the court instructed the jury that it could make such an award only if it found that the disregard of Vasbinder's First Amendment rights was malicious or wanton. Thus, the jury was advised that it might award such damages

> to punish the defendants and others like him and to prevent him from committing such conduct in the future. You may award plaintiff punitive damages if you find that either or both of the defendants' actions were done maliciously or wantonly.
>
> An act is maliciously done if it is prompted by ill will or spite toward the plaintiff. An act is wantonly done if it is done in reckless or careless disregard of or with indifference to the rights of the injured plaintiff.
>
> The plaintiff has the burden of proving by a fair preponderance of the credible evidence that a defendant acted maliciously or wantonly with regard to his rights. I instruct you, however, that

even if plaintiff succeeds in proving that a defendant acted maliciously or wantonly, an award of punitive damages is entirely discretionary. Even if the legal damages [*sic*] for punitive damages are satisfied, you may still decide not to award punitive damages.

In making this particular decision, you should consider the underlying purpose of punitive damages. Punitive damages are awarded to punish a defendant for outrageous conduct and to deter him and others like him from engaging in similar conduct in the future.

Thus, in deciding whether to award punitive damages, you should consider whether the defendant may be adequately punished by an award of actual damages only or whether the conduct is so extreme and outrageous that actual damages are inadequate to punish the wrongful conduct. You should also consider whether actual damages, standing alone, are likely to deter or prevent this defendant and others like him from engaging in the wrongful acts that may have been performed or whether punitive damages are necessary to provide deterrence.

Thus, the instructions in the present case did not purport to advise the jury that the threshold for an award of compensatory damages was the same as that for an award of punitive damages.

■ Moreover, we disagree with the trial court's assessment that "to hold, *on this record*, that punitive damages were legally warranted would be to equate success on the merits of the underlying cause of action with entitlement to punitive damages." Posttrial Order at 4 (emphasis added). If Scott and Switzer had been somewhat more forthright and taken the position that they could no longer work with Vasbinder and demoted him because of his contact with the FBI, Vasbinder would still have prevailed on his First Amendment claim because defendants failed to show that, in light of the seriousness of the matters communicated to the FBI, the state's efficiency interests outweighed Vasbinder's speech interests.

The present record, however, taken in the light most favorable to Vasbinder, shows culpable conduct well in excess of any such forthright action. Instead of pleading inefficiency born of lack of trust due to the FBI contact, Scott and Switzer, while taking their actions because of that contact, filled Vasbinder's record with damaging personnel actions. Thus, though they previously had consistently rated Vasbinder's performance as very high or "outstanding," though OVR placements flourished with Vasbinder as statewide coordinator, and though the audit resulting from Vasbinder's actions caused OVR to revise its procedures and to seek credits from several private facilities, as soon as Vasbinder revealed that he had spoken to the FBI, defendants found his performance "barely effective." They promptly stripped him of his most significant duties as statewide coordinator and then increased his probationary period; the jury could well have found this two-step sequence in itself devious, for it seems to minimize the opportunity for the employee to prove his merit in the extended period. Indeed, Vasbinder's probationary appointment was terminated months before the end of the extended period, since, as soon as Scott was informed that the government would not bring criminal charges, Vasbinder was officially demoted.

In sum, though Scott conceded at trial that Vasbinder's concerns were genuine, and though he and Switzer had promoted Vasbinder with full awareness of the personality problems on which they purported to rely in demoting him, Scott and Switzer chose to proceed, after learning of Vasbinder's report to the FBI, by filling his record with damaging evaluations and job modifications. On this view of the record, it was not irrational or impermissible for the jury to infer that defendants' personnel actions toward Vasbinder were in callous disregard of his rights, and were intended both to deter other potential whistle-blowers and to disguise the retaliatory nature of their action from outsiders. It was surely within the jury's discretion to send a message, to Scott and Switzer and to others, that such retaliation is intolerable.

Accordingly, we reverse so much of the judgment as dismissed Vasbinder's claim for punitive damages, and we remand for a trial as to the amount to be awarded.

Finally, we are constrained to note the practical flaw in the trial court's decision to dismiss the punitive damages claim without having the jury make a finding as to the amount of punitive damages it would have awarded. We have repeatedly cautioned trial judges, usually in the context of liability determinations, that it is preferable, " 'in the best interests of efficient judicial administration,' " to refrain from granting directed verdicts and to allow the case to be decided, at least in the first instance, by the jury. *See, e.g., Konik v. Champlain Valley Physicians Hospital Medical Center,* 733 F.2d 1007, 1013 n. 4 (2d Cir.) (quoting *Mattivi v. South African Marine Corp., "Huguenot",* 618 F.2d at 166 & n. 2), *cert. denied,* 469 U.S. 884, 105 S.Ct. 253, 83 L.Ed.2d 190 (1984); *Ebker v. Tan Jay International, Ltd.,* 739 F.2d 812, 824 n. 15 (2d Cir.1984). Thereafter, if the court believes the jury has reached an irrational verdict, it may grant judgment n.o.v.; if that ruling is reversed on appeal, the matter may be efficiently concluded by reinstatement of the jury's verdict, without the need to hold an entire new trial. This principle is no less applicable to issues of damages. *See, e.g., Oboler v. Goldin,* 714 F.2d 211, 212–13 (2d Cir.1983).

■ In the present case, we have no difficulty in theory with a bifurcation of the punitive damages issue, postponing the jury's consideration of the amount of such an award until a later stage in the trial. Punitive damages are to be tailored to the defendant's ability to pay, and normally that class of evidence is not admitted or desirable during the liability and compensatory damages phase of the case. *See, e.g., Smith v. Lightning Bolt Productions, Inc.,* 861 F.2d 363, 373–74 (2d Cir.1988); *Simpson v. Pittsburgh Corning Corp.,* 901 F.2d 277, 283 (2d Cir.), *cert. dismissed,* —— U.S. ——, 111 S.Ct. 27, 111 L.Ed.2d 840 (1990). However, once the jury had returned its finding that punitive damages should be awarded, the court should have proceeded directly to a resolution of the amount—taking such appropriate additional evidence as the parties wished to present, asking the jury to determine an amount, and reserving the right to set aside the award thereafter through the grant of judgment n.o.v. Had this procedure been followed, our reversal on this appeal could be followed efficiently by reinstatement of the jury's verdict. Given the court's dismissal without allowing the jury to determine the amount, however, the matter now will apparently have to go back for a duplicative presentation of the evidence as to the defendants' actions so that a new jury may assess the amount to be awarded.

## CONCLUSION

We have considered all of the arguments of Scott and Switzer on the present appeal and cross-appeal and have found them to be without merit. The judgment of the district court is reversed insofar as it set aside the jury's award of punitive damages, and the matter is remanded for trial as to the amount of such damages to be awarded. In all other respects the judgment is affirmed.