UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

Nos. 93-1691
93-2372

UNITED STATES OF AMERICA, ET AL.,
Plaintiffs, Appellees,

v.

CHARLES GEORGE TRUCKING, INC., ET AL.,
Defendants, Appellants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before
Selya and Cyr, Circuit Judges,

and Zobel,* District Judge.

Richard E. Bachman, with whom John A. King and Hale,

Sanderson, Byrnes & Morton, were on brief, for appellants.

John C. Cruden, with whom Louis J. Schiffer, Acting

Assistant Attorney General, Robert H. Oakley, David W.

Zugschwerdt, David C. Shilton, and Elizabeth A. Peterson,

Attorneys, U.S. Dep't of Justice, and Ruthann Sherman, Office of

Regional Counsel (EPA), for the federal appellee.
Scott Harshbarger, Attorney General, Karen McGuire and

Margaret Van Deusen, Assistant Attorneys General, and Nancy

Preis, Special Assistant Attorney General, on brief for appellee

Commonwealth of Massachusetts.
Paul B. Galvani, with whom Thomas H. Hannigan, Jr., Jay

Bradford Smith, and Ropes & Gray were on brief, for various

appellees.
Laurence M. Johnson, Fordham & Starrett, Michael D. Chefitz,

and Gilberg, Kurent & Kiernan, on brief for appellees Charles

George, Jr., et al.
Mark S. Granger and Morrison, Mahoney & Miller on brief for

appellee Boston Edison Co.

September 13, 1994

*Of the District of Massachusetts, sitting by designation.

SELYA, Circuit Judge. These appeals arise out of two
SELYA, Circuit Judge.

consent decrees that together resolve a majority of the cost

recovery disputes associated with the cleanup of a hazardous

waste site in Tyngsboro, Massachusetts (the Site). Appellants,

who are the principal owners and operators of the Site,1 strive

to convince us that the district court misjudged the relevant

goals of the Comprehensive Environmental Response, Compensation &

Liability Act (CERCLA), 42 U.S.C. 9601-9675, and, therefore,

erred in placing its imprimatur on the decrees. We are not

persuaded.

I. BACKGROUND

This litigation dates back to 1985, when the United

States and the Commonwealth of Massachusetts filed separate cost

recovery actions, soon consolidated, against appellants and other

alleged owner-operators (collectively, "the junior Georges"),

including Charles George, Jr. and James George (children of

Charles and Dorothy George), and the sons' firm, C & J Trucking

Co. The federal government's complaint alleged claims under 42

U.S.C. 9604(a), 9604(b), 9604(e), 9607(a), 6928(a) & 6928(g).

The Commonwealth's complaint alleged claims under 42 U.S.C.

9607(a) and Mass. Gen. Laws ch. 21E, 5.

The early procedural history of the struggle is

described in a previous opinion of this court, see United States

v. Charles George Trucking Co., 823 F.2d 685 (1st Cir. 1987), and

1Charles George, his wife Dorothy George, Charles George
Trucking, Inc., and Charles George Land Reclamation Trust appear
as appellants. We are not required to differentiate among them.

2

need not be revisited. Thereafter, acting on plaintiffs'

motions for partial summary judgment, the district court adjudged

appellants to be jointly and severally liable for the costs of

cleanup. However, the court left open the question of the junior

Georges' liability due to factual disputes anent the degree of

control that they exercised over the Site.

In June of 1989, plaintiffs amended their complaints to

add twenty-four generator and transporter defendants. In turn,

these defendants brought third-party claims for contribution

against thirty-one other putative generators. They also filed

counterclaims against the plaintiffs, charging negligent

regulation. Appellants emulated this tactic, serving similar

counterclaims.

The district court intervened to impose some structure

on this welter of claims and cross-claims. By a case management

order (CMO) dated April 12, 1990, Judge Woodlock deemed the

third-party defendants to have asserted all available cross-

claims and counterclaims against other parties, but precluded the

plaintiffs from asserting claims directly against the third-party

defendants. The judge supplemented the CMO in a subsequent bench

ruling through which he limited development of so-called trans-

shipment issues, that is, issues involving wastes hauled to the

Site after first being dumped elsewhere.

By the fall of 1991, the dust had settled. A new round

of summary judgment motions had been heard (most were denied),

and trialworthy issues had been identified as to the liability of

3

all defendants, save only the appellants, and as to virtually all

aspects of the remedial phase. Unresolved questions also

remained as to the counterclaims asserted against the plaintiffs.

The likelihood of lengthy litigation loomed large.

Before too long, settlement negotiations began in

earnest. After a fitful start, the district court appointed

Chief Judge Tauro as a settlement master.2 Numerous meetings

among the parties yielded an agreement by the plaintiffs, in

essence, to extinguish all claims against the generators and

transporters (including the third-party defendants) in exchange

for a global "cash-out" payment of approximately $36,000,000.

The generators and transporters were to decide among themselves

how to share the aggregate cost of the settlement. The federal

and state governments agreed to contribute an additional

$3,103,712 as a token of their responsibility. After further

negotiations, again held under Judge Tauro's auspices, the

plaintiffs and the junior Georges also reached an accord,

proposing to extinguish the latters' liability in return for a

payment of $3,100,000. Though appellants participated in

bargaining sessions from time to time, they eventually withdrew

from the negotiations. The claims against them remain

unresolved.

2Judge Tauro is the Chief Judge of the United States
District Court for the District of Massachusetts. We applaud
Judges Tauro and Woodlock for their creative approach to the
resolution of this complex case. We urge other jurists to
consider collaborative efforts of this sort when circumstances
warrant.

4

The settling parties prepared two proposed consent

decrees. They presented the first, embodying the settlement

reached by the plaintiffs with the generators and transporters,

to the district court on December 17, 1992. They presented the

second, embodying the plaintiffs' suggested settlement with the

junior Georges, on July 27, 1993. Both were advertised in the

Federal Register, see 28 C.F.R. 50.7, but elicited no public

comment.

At a hearing held on May 24, 1993, Judge Woodlock

applied the standards set forth in United States v. Cannons

Engineering Corp., 899 F.2d 79, 85 (1st Cir. 1990), and found the

generator/transporter decree to be reasonable, fair, and faithful

to CERCLA's objectives. Following a separate hearing held on

November 12, 1993, the court made similar findings in regard to

the second decree. Judge Woodlock entered both decrees under

Fed. R. Civ. P. 54(b), thus permitting appellants, as the lone

objectors, to prosecute these appeals.

II. STANDARD OF REVIEW

Despite appellants' animadversions, Cannons has not

rusted. It teaches that CERCLA consent decrees must be

reasonable, faithful to the statute's objectives, and fair (both

procedurally and substantively). Cannons, 899 F.2d at 85. The

battle over whether a particular decree achieves these benchmarks

will usually be won or lost in the trial court. By the time such

decrees arrive on the doorstep of the court of appeals, they are

"encased in a double layer of swaddling." Id. at 84. In the

5

first place, a trial court, without abdicating its responsibility

to exercise independent judgment, must defer heavily to the

parties' agreement and the EPA's expertise. See id. In this

case, the inner layer of swaddling is especially thick because of

the role played by the distinguished special master in overseeing

negotiations. The second basis for deference is equally

compelling. Because an appellate court ordinarily cannot rival a

district court's mastery of a factually complex case a mastery

that is often, as in this instance, acquired through painstaking

involvement over many years the district court's views must

also be accorded considerable respect.

Largely in consequence of these layers of protective

swaddling, an appellate tribunal may overturn a district court's

decision to approve or reject the entry of a CERCLA consent

decree only for manifest abuse of discretion. In this case,

then, the decision below stands unless the objectors can show

that, in buying into either or both of the decrees, the lower

court made a serious error of law or suffered a meaningful lapse

of judgment. See id.

III. DISCUSSION

Appellants advance four sets of arguments in support of

their claim that the district court too freely accepted the

proposed settlement. We proceed to examine each of the four

components that comprise this asseverational array.

A. Reasonableness.

A CERCLA consent decree is reasonable when it provides

6

for an efficacious cleanup, and at the same time adequately

compensates the public for the cost of that cleanup. See id. at

89-90. Efficacy is not merely a function of how close a

settlement comes to meeting a scientifically defined ideal, nor

is adequacy merely a function of how close a settlement comes to

meeting an estimate of projected costs. These are, rather,

pragmatic concepts, and evaluating them requires common sense,

practical wisdom, and a dispassionate assessment of the attendant

circumstances.

In this case, appellants question the efficacy of the

proposed cleanup, and claim that they are entitled to an

evidentiary hearing on the matter. In support of the first half

of this objection, appellants do little more than plagiarize

plaints from prior pleadings filed by other parties in opposition

to plaintiffs' previous motions for partial summary judgment;

they do not attempt to explain these points, fail to set forth

supporting documents in a record appendix, and rely on rhetoric

to the exclusion of either record citations or scientific fact.

We reject appellants' objection on two bases. First,

it is presented to us in a slipshod fashion, without developed

argumentation, and is, therefore, not entitled to substantive

consideration. See Ryan v. Royal Ins. Co., 916 F.2d 731, 734

(1st Cir. 1990); United States v. Zannino, 895 F.2d 1, 17 (1st

Cir.), cert. denied, 494 U.S. 1082 (1990). Second, our

independent review of the record leaves us confident that Judge

Woodlock acted well within the realm of his discretion in

7

concluding that the consent decrees incorporated a suitable set

of remedies.

The second half of the objection is similarly

unavailing. The district court did not err in declining to hold

an evidentiary hearing to delve into matters of efficacy.

Requiring hearings to review the reasonableness of CERCLA consent

decrees as a matter of course would frustrate the statutory

objective of expeditious settlement. See Cannons, 899 F.2d at

94. Consequently, requests for evidentiary hearings are, for the

most part, routinely denied and properly so at the consent

decree stage in environmental cases. See, e.g., United States v.

Metropolitan St. Louis Sewer Dist., 952 F.2d 1040, 1044 (8th Cir.

1992); State of Ariz. v. Motorola, Inc., 139 F.R.D. 141, 148 (D.

Ariz. 1991); United States v. Bliss, 133 F.R.D. 559, 568 (E.D.

Mo. 1990); United States v. Rohm & Haas, 721 F. Supp. 666, 686-87

(D.N.J. 1989) (collecting earlier cases). While a hearing may be

necessary or desirable in special circumstances, see, e.g.,

United States v. Town of Moreau, 751 F. Supp. 1044, 1051

(N.D.N.Y. 1990), such cases are relatively rare.

This case invokes the general rule, not the long-odds

exception to it. The court had ample information before it, and,

even without an evidentiary hearing, the parties had "a fair

opportunity to present relevant facts and arguments to the court,

and to counter the opponent's submissions." Aoude v. Mobil Oil

Corp., 862 F.2d 890, 894 (1st Cir. 1988). Moreover, appellants

have pointed to nothing out of the ordinary that would suggest a

8

particularized need for an evidentiary hearing. Under these

circumstances, we turn a deaf ear to appellants' lament.3

B. Fidelity to the Statute.

Among the overarching goals of CERCLA recognized by the

courts are "accountability, the desirability of an unsullied

environment, and promptness of response activities." Cannons,

899 F.2d at 91. Appellants insist that Judge Woodlock's

endorsement of the consent decrees undermined one of these goals

accountability in two separate ways.

Appellants' main argument is that the allocation method

embodied in the first consent decree failed to specify each

individual generator's and transporter's degree of culpability.

As a factual matter, appellants are correct; the consent decrees

did no more than assign payment responsibilities to classes of

potentially responsible parties (PRPs), leaving the question of

allocation inter sese to the class members themselves. But we

see no reason to prohibit such an approach. Realistically, a

government agency, in the midst of negotiations, is in no

position to put so fine a point on accountability. We,

therefore, endorse, in general, EPA's practice of negotiating

with a representative group of PRPs and then permitting the group

members to divide the burden of the settlement among themselves.

This is, as one court has said, a "practical and

3Appellants also disparage the adequacy of the
generator/transporter settlement from a financial standpoint. As
we explain in Part III(B), infra, their criticism is unfounded.

9

reasonable process for achieving settlements." United States v.

Acton Corp., 733 F. Supp. 869, 873 (D.N.J. 1990). It is also

faithful to CERCLA's goals. After all, the ultimate measure of

accountability in an environmental case is the extent of the

overall recovery, not the amount of money paid by any individual

defendant.

Over and beyond these generalities, there is an

especially compelling reason for accepting a class-wide

allocation here. Judge Woodlock supportably found that

appellants' records were wholly inadequate. A lack of reliable

records renders it impossible, as a practical matter, for a court

to make reasoned findings concerning the relative contributions

of particular generators or transporters to the aggregate harm.

So it is here. And, moreover, because the shortage of records

can be directly attributed to appellants' stewardship of the

Site, they can scarcely be heard to complain that the settling

parties resorted to, and the court then approved, a class-wide

allocation.

Appellants' fallback position is predictable: in a

refrain evocative of one of their attacks on the decrees'

reasonableness, see supra note 3, they insinuate that the first

consent decree compromised the goal of accountability by setting

too modest a price tag on the generator/transporter settlement.

Appellants have an easily envisioned stake in this aspect of the

matter: as the sole non-settling defendants, they are

potentially liable for the full difference between the costs of

10

cleanup and the total amount paid by the settling PRPs. See 42

U.S.C. 9613(f)(2), 9622(h)(4); see also United Technologies

Corp. v. Browning-Ferris Indus., Inc., F.3d , (1st

Cir. 1994) [No. 93-2253, slip op. at 17-18] (explaining interface

between settlement and liability of PRPs for contribution in

CERCLA cases). If, say, the overall clean-up costs eventually

total $70,000,000 the highest of the differing estimates that

have been bandied about appellants are staring down the barrel

of a $21,000,000 shortfall. Appellants claim their aggregate net

worth amounts to only a tiny fraction of this exposure. On this

basis, they contend that the plaintiffs sold out too cheaply, for

many of the settling parties have very deep pockets.

Although we understand appellants' consternation, these

considerations are virtually irrelevant. In the first place, the

district court found that appellants are liable for all clean-up

costs and that finding is not disputed on appeal. As is true

of any assessment of compensatory damages, the liable party's

ability to pay should not influence the amount of the assessment.

See generally 22 Am. Jur. 2d Damages 952 (explaining that

evidence of a defendant's pecuniary resources is generally

inadmissible in cases where only compensatory damages are

recoverable); Vasbinder v. Ambach, 926 F.2d 1333, 1344 (2d Cir.

1991) (applying principle).

To be sure, at the next step relative wealth may have

some practical bearing. When defendants are jointly and

severally liable, the prevailing party may choose to collect the

11

entire indebtedness from one or more of the liable parties, to

the exclusion of others. See, e.g., McDonald v. Centra, 118 B.R.

903, 914 (D. Md. 1990), aff'd, 946 F.2d 1059 (4th Cir. 1991),

cert. denied, 112 S. Ct. 2325 (1992). But when, as in this case,

liability is contested, much more than the PRPs' relative

affluence must be considered.

With this in mind, the proper way to gauge the adequacy

of settlement amounts to be paid by settling PRPs is to compare

the proportion of total projected costs to be paid by the

settlors with the proportion of liability attributable to them,

and then to factor into the equation any reasonable discounts for

litigation risks, time savings, and the like that may be

justified.

Inspected through that lens, the first consent decree

looks entirely appropriate. The district judge explicitly found

that the generators and transporters collectively were

responsible for fifty percent of the environmental damage. Under

the terms of the negotiated settlement, the payment to be

tendered by the generators and transporters as a group

(approximately $36,000,000) represents more than half of the

highest estimate of aggregate clean-up costs ($70,000,000).

Thus, the settlement is favorable to the government agencies even

before allowances are made for appropriate discounts, such as

litigation risks, the benefit derived from shelving the

12

counterclaims, and the desirability of expediting the cleanup.4

Accordingly, appellants' accountability challenge lacks force.

C. Fairness.

In a somewhat related vein, appellants protest

vehemently that Judge Woodlock evaded his obligation to make a

finding on substantive fairness by failing to explain the

settlements' allocation of responsibility either within or among

the various classes of defendants. In support, appellants

isolate a passage in Cannons in which we wrote:

Substantive fairness introduces into the
equation concepts of corrective justice and
accountability: a party should bear the cost
of the harm for which it is legally
responsible. The logic behind these concepts
dictates that settlement terms must be based
upon, and roughly correlated with, some
acceptable measure of comparative fault,
apportioning liability among the settling
parties according to rational (if necessarily
imprecise) estimates of how much harm each
PRP has done. . . . Whatever formula or
scheme EPA advances for measuring comparative
fault and allocating liability should be
upheld so long as the agency supplies a
plausible explanation for it, welding some
reasonable linkage between the factors it
includes in its formula or scheme and the
proportionate shares of the settling PRPs.

4For what it may be worth, the settlement compares quite
favorably to the universe of CERCLA settlements, inasmuch as such
settlements often compensate the public for only a tiny fraction
of the overall expense. See, e.g., In re Acushnet River, 712 F.

Supp. 1019, 1031-32 (D. Mass. 1989) (approving settlement by
primary owner/operator for $2,000,000 in contrast to projected
total clean-up cost of $34,000,000); City of New York v. Exxon

Corp., 697 F. Supp. 677, 693-94 (S.D.N.Y. 1988) (approving

settlement by seven of fifteen defendants for less than
$14,000,000 in contrast to projected total clean-up cost of
$400,000,000).

13

Cannons, 899 F.2d at 87 (citations omitted).

Appellants' error is to read Cannons without regard for

its facts. Cases resolve particular controversies, and the

standards they articulate often are framed in a certain way

primarily to rebut an argument raised by a litigant. Thus, in

Cannons, the quoted passage rebuffed a challenge to a particular

method of allocation. It cannot be ripped root and branch from

that context. In a passage conveniently overlooked by

appellants, Cannons makes this very point; the court recognized

that the standards it limned were not to be applied woodenly:

[W]e are quick to concede that [fairness,
reasonableness, and fidelity to the statute]
are all mutable figures taking on different
forms and shapes in different factual
settings. Yet, the concepts' amorphous
quality is no accident or quirk of fate. We
believe that Congress intended, first, that
the judiciary take a broad view of proposed
settlements, leaving highly technical issues
and relatively petty inequities to the
discourse between parties; and second, that
the district courts treat each case on its
own merits, recognizing the wide range of
potential problems and possible solutions.

Id. at 85-86.

In the circumstances of this case a case that bears

scant resemblance to Cannons we do not believe that substantive

fairness required a more detailed explanation of either the

allocation or the allocation method. Three considerations pave

the way to this conclusion.

First: There is little need for a court to police the
First:

substantive fairness of a settlement as among settling parties of

a particular class. Sophisticated actors know how to protect

14

their own interests, and they are well equipped to evaluate risks

and rewards. A trial court can, therefore, usually confine its

inquiry to the substantive fairness of the aggregate class

contribution, or, put another way, to the proposed allocation of

responsibility as between settling and non-settling PRPs. Here,

the trial court performed this task in exemplary fashion. It

would have served no useful purpose to go further and focus the

lens of inquiry on the fairness of each class member's

contribution.

Second: It is impossible to explain an allocation of
Second:

liability in minute detail when, as now, the historical record is

incomplete. And, though we hold district courts to high

standards of excellence, we do not expect them to do the

impossible. Thus, it is not surprising that most courts

recognizing an obligation to make findings on comparative fault

in the CERCLA context have framed the obligation in such a way as

to afford an exception for cases in which reliable information is

unavailable. See id. at 88 (explaining need for flexibility in

weighing substantive fairness, particularly when the available

information is "ambiguous, incomplete, or inscrutable"); United

States v. Bell Petroleum Serv., 21 Envtl. L. Rep. 20,374,

[1990 U.S. Dist. LEXIS 14066 at *8-*10] (W.D. Tex. 1990)

(rejecting the argument that, in order to deem a settlement fair,

a court must find that a party's settlement corresponds to its

fair share of liability, even when "no method of dividing the

liability among the [d]efendants" exists that would not involve

15

"pure speculation"); Rohm & Haas, 721 F. Supp. at 689 (stating

that whether a settlement bears a reasonable relation to some

plausible range of estimates of comparative fault is a

determination that must be "based on the record"); see also

United States v. Conservation Chem. Co., 628 F. Supp. 391, 402

(W.D. Mo. 1985) (declaring that a court should spurn a settlement

which "arbitrarily or unreasonably ignores the comparative fault

of the parties, where there is a reasonable basis for allowing

that comparison to be made") (emphasis supplied).

Such an exception is vitally important because a

muddled record is the norm in most CERCLA litigation. See

Cannons, 899 F.2d at 88 (citing authority); see also Lynnette

Boomgaarden & Charles Breer, Surveying the Superfund Settlement

Dilemma, 27 Land & Water L. Rev. 83, 121 (1992) ("In most CERCLA

actions, the government has difficulty accurately proving

contribution amounts. Poor records, faulty memories, and a

desire to escape liability all add to this difficulty."); Barry

S. Neuman, No Way Out? The Plight of the Superfund Nonsettlor,

20 Envtl. L. Rep. 10,295, 10,299 (July 1990) ("In virtually all

CERCLA cases, the recollections of waste haulers and site

owner/operators are likely to be questionable, the documentation

linking some generators to a specific site subject to attack, and

the evidence generally incomplete.").

We conclude that so long as the basis for a sensible

class-wide approximation is at hand an approximation "roughly

correlated with some acceptable measure of comparative fault,"

16

Cannons, 899 F.2d at 87 (emphasis supplied) difficulties in

achieving precise measurements of comparative fault will not

preclude a trial court from entering a consent decree. On this

understanding, we uphold the district court's division of

responsibility between owner/operators, on one hand, and

generators/transporters, on the other hand. On this record,

splitting the responsibility between those two groups does not

offend our sense of fairness.5 Cf., e.g., 2 Kings 3:16-18

(describing original Solomonic solution).

Third: As we wrote in Cannons, fairness is "mutable .
Third:

. . , taking on different forms and shapes in different factual

settings," id. at 85. To that extent, fairness is an elusive

concept. When substantive fairness cannot be measured directly,

a court must devise alternate methods of testing for it.

Here, Judge Woodlock noted the lack of direct evidence

of substantive fairness but ruled that such evidence was not

essential because substantive fairness flowed as a natural

consequence from procedural fairness. Then, after eliciting a

concession from appellants' counsel that ample basis existed to

allocate responsibility between different classes of defendants,

the court proceeded to make a substantive fairness finding of

limited reach, determining that the generators and transporters,

collectively, were responsible for one-half of the overall

5Appellants concentrate their fire on the first consent
decree, and do not attack the substantive fairness of the
allocation approved vis-a-vis the junior Georges. At any rate,
that allocation, too, seems supportable.

17

damage.

We discern no error. Although appellants take umbrage

at the idea that one type of fairness serves to assure the other,

providing such an assurance is precisely the function of

procedural fairness. Cf., e.g., Sir Henry Maine, Dissertations

on Early Law and Custom 389 (1886) ("Substantive law has . . .

the look of being gradually secreted in the interstices of

procedure."). There exist many cases in which the data is so

fragmentary that a district court cannot be held to the letter of

the Cannons substantive fairness standard. In such cases, a

finding of procedural fairness together with other circumstantial

indicia of fairness, may constitute an acceptable proxy. See

Neuman, supra, at 10,299 (postulating that incomplete records are

so common in CERCLA litigation that, no matter how thorough a

review the court undertakes, the search for substantive fairness

typically collapses into a search for procedural fairness).

This is such a case. By all accounts, the conduct of

the settlement negotiations, under the supervision of Chief Judge

Tauro, was a textbook model so much so that appellants do not

press any objections to procedural fairness. We are thus

reinforced in our conclusion that the lower court's fairness

findings were both permissible and supportable.

D. The Scope of the Consent Decrees.

Appellants' final set of arguments forces us to step

outside the range of Cannons. Appellants claim that the consent

decrees are overbroad both because they addressed claims that

18

were not pleaded and because they addressed claims that had been

sidetracked by the CMO.

1. The Standard. In its definitive statement
1. The Standard.

concerning the scope of consent decrees, the Supreme Court

explained that a court cannot lend its imprimatur to a settlement

unless:

(1) it "spring[s] from and serve[s] to
resolve a dispute within the court's subject
matter jurisdiction"; (2) it `come[s] within
the general scope of the case made by the
pleadings'; and (3) furthers the objectives
upon which the complaint was based.

Local No. 93, Int'l Ass'n of Firefighters v. Cleveland, 478 U.S.

501, 525-26 (1986); (citations omitted); accord Conservation Law

Found. v. Franklin, 989 F.2d 54, 59 (1st Cir. 1993). We apply

this standard to the consent decrees at issue as a means of

testing appellants' twin objections.

2. Natural Resource Damages. Appellants' complain
2. Natural Resource Damages.

that the decrees resolved potential claims for damages to natural

resources that were never pleaded and, accordingly, were not

properly before the court. Even if we assume for the sake of

argument that these claims would not have surfaced at a trial,

appellants' objection is fruitless.

The objection calls into question only the second of

the Firefighters requirements and that requirement is satisfied

in this instance. Indeed, the natural resource damage claims

discussed in the decrees exemplify the type of related claims

envisioned by the Justices as coming within the authority of an

approving court. They are claims that, though not expressly set

19

out in the pleadings, fall within their general scope.6

3. Claims Precluded Under the Case Management Order.

Appellants' next complain that the consent decrees disposed of

claims that could not have been litigated under the terms of the

CMO, namely, potential claims by the plaintiffs against third-

party defendants and potential claims anent trans-shipment

issues. Insofar as we can tell, it is a question of first

impression whether a consent decree may resolve claims that the

parties were precluded from litigating under the court's own case

management orders. On reflection, we believe that question must

be answered affirmatively.

CMOs are designed to serve a variety of pragmatic

objectives. These include not only expediting and focusing the

litigation, see Fed. R. Civ. P. 16(a)(1)-(4), but also, as the

current version of the rule recognizes, facilitating settlement,

see Fed. R. Civ. P. 16(a)(5).7 We think it follows that case

management is an area in which the district court has

"considerable discretion." Geremia v. First Nat'l Bank, 653 F.2d

6Appellants' contention to the contrary relies almost
exclusively on the opinion in City of New York v. Exxon Corp.,

697 F. Supp. 677 (S.D.N.Y. 1988). But Exxon is easily

distinguished. There, the district court refused to approve a
settlement involving a non-party. See id. at 687. The court

reasoned that it had no power to resolve a dispute outside its
subject matter jurisdiction. Id. at 687-88. The case at bar

poses very different problems, bereft of jurisdictional
overtones.

7We note that, in practice, these two sets of goals often go
hand in hand. To hold settling parties to the strictures of a
CMO, come what may, would place the two goals in tension with one
another.

20

1, 5 (1st Cir. 1981). Although a CMO will ordinarily "control

the subsequent course of the action," Fed. R. Civ. P. 16(e), it

may be modified by subsequent order at the district court's

pleasure, see Ramirez Pomales v. Becton Dickinson & Co., 839 F.2d

1, 3 (1st Cir. 1988), or, in the case of a final CMO, to prevent

manifest injustice, see Fed. R. Civ. P. 16(e). More

specifically, the trial court has very broad discretion to modify

a preexisting case management order to facilitate settlements, at

least in the absence of unfair prejudice. See generally 6A

Charles A. Wright et al., Federal Practice and Procedure

1525.1, at 253-54 (1990) (discussing district court's authority

to encourage settlements). We see no unfair prejudice to

appellants from the court's wise exercise of its discretion here.

Once we have reached this plateau, the rest flows

naturally. It is evident from the very nature of case management

orders that they are not jurisdictional in effect. Thus, the

first Firefighters requirement is fulfilled. And as we explain

below, the second and third Firefighters requirements also are

met.

That the third-party and trans-shipment claims come

within the general scope of the pleadings and advance the

objectives of the plaintiffs' complaints cannot be gainsaid.

CERCLA cost recovery actions are initiated in the hope of

resolving all issues revolving around a particular Superfund

site, and frequently, in the hope that resolution will take the

form of a global settlement. This is consistent both with the

21

statutory design and the common good. In the words of the

district court:

It would have been a foolish or odd consent
decree that did not incorporate within it all
of the potential claims that can and could
have arisen out of th[is] litigation. . . .
[I]t is altogether proper, indeed, in the
larger public interest for [the court] to
leave no loose threads.

Moreover, the Supreme Court has made clear that there

is no per se prohibition against consent decrees that exceed the

possible bounds of a decision issued directly by the trial court.

Because a consent decree is animated not only by the parties'

legal claims but also by the parties' consent, a court is "not

necessarily barred from entering a consent decree merely because

the decree provides broader relief than the court could have

awarded after trial." Firefighters, 478 U.S. at 525. Viewed in

this light, we do not think that the scope of the consent decrees

exceeded the bounds of the trial court's discretion.

To recapitulate, then, a CERCLA consent decree may

(and, in many cases, should) sweep more broadly than would the

court's judgment in the event that the litigation culminated in a

full-dress trial. Because this is true, and because the consent

decrees pass Firefighters muster in all respects, we reject

appellants' contention that the decrees are overbroad.

IV. CONCLUSION

We need go no further. Finding, as we do, that

appellants' asseverational array contains more cry than wool, we

hold that the district court acted lawfully in approving the

22

consent decrees at issue here.

Affirmed.

23