**UNITED STATES of America, Plaintiff,**

**v.**

**Pauline LONG, Oren Long, and Jane Long, Defendants.**

**Civ. A. No. C–1–87–167.**

United States District Court,
S.D. Ohio, W.D.

May 13, 1987.

Gerald F. Kaminski, Asst. U.S. Atty., Cincinnati, Ohio, for U.S.

Lanny R. Holbrook, Kent W. Seifried, Cincinnati, Ohio, for Pauline Long.

Marc D. Dietz, John R.S. Brooking, Covington, Ky., for Oren and Jane Long.

## ORDER

SPIEGEL, District Judge.

■ After considering plaintiff United States' Motion for Immediate Order in Aid of Access and supporting memorandum, and the arguments of counsel, the Court holds that Section 104(e) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 ("CERCLA"), 42 U.S.C. § 9604(e), as amended by the Superfund Amendments and Reauthorization Act ("SARA"), Pub.L. No. 99–499, 100 Stat. 1613 (October 17, 1986), authorizes the Environmental Protection Agency ("EPA") to have access to property for the purposes of undertaking investigative, engineering, design and remedial activities where EPA has a reasonable basis to believe that there may be a release or threat of a release of a hazardous substance or pollutant or contaminant from the property.

■ The Court finds that EPA has determined that there may be a release or threat of a release of a hazardous substance from property owned by defendants Pauline Long, and Oren and Jane Long, located at Big Four and Smalley Roads in the City of Reading, Hamilton County, Ohio, which includes the Superfund site listed on the National Priorities List as the Pristine site (the "defendants' property"). The Court further finds that EPA's determination is not arbitrary or capricious and that plaintiff is entitled under Section 104(e) of CERCLA, 42 U.S.C. § 9604(e), to access to the property owned by the defendants as requested in its motion.

Accordingly, the Court grants plaintiff United States' Motion for Immediate Order in Aid of Access and hereby orders that the defendants Pauline Long, Oren and Jane Long be permanently enjoined from in any way restricting entry and access by EPA or its designated representatives to the defendants' property for the following activities:

A. Any activities which EPA deems necessary pursuant to its Remedial Investigation to determine fully the nature and extent of contamination associated with the Pristine site, including, but not limited to, those activities described on attachment A, which is incorporated herein;

B. Any activities which EPA deems necessary for completion of its Feasibility Study for the Pristine site;

C. Any engineering studies which EPA deems necessary to design the Remedial Action selected by EPA for the Pristine site;

D. Any activities which EPA deems necessary to implement the Remedial Action selected by EPA for the Pristine site;

E. Any activities which EPA deems necessary for operation and maintenance of the Remedial Action selected for the Pristine site; and

F. Any other activities on the defendants' property which EPA deems necessary for the purposes of determining the need for response action, or choosing or taking any response action or otherwise enforcing the provisions of CERCLA, 42 U.S.C. § 9601 *et seq.*

Prior to initiation of activities performed by EPA or its representatives on defendants' property, EPA shall provide the defendants or their representative with oral or written notice at least 24 hours before the time of initiation of such activities.

## ATTACHMENT A

### ADDITIONAL FIELD WORK PLANNED AT PRISTINE, INC. SITE

U.S. EPA will conduct Phase II of its Remedial Investigation (Phase II RI) to fill in data gaps identified during the completion of the remedial investigation report and the initial stage of the feasibility study. The scope of the Phase II RI field investigation will include the following sampling activities.

- Fifteen to twenty surface and soil boring samples collected and analyzed for full Hazardous Substance List (HSL) parameters by a Contract Laboratory Program laboratory. These samples are necessary to characterize the magnitude and extent of contamination in the area just south of the concrete tank approximately 275 feet north of the southern most access road, known as the "magic pit", as shown on Exhibit A. Additional surface soil samples from the area near the incinerator and from the incinerator ash pile will be analyzed for dioxin/furans. The number of dioxin/furan samples to be collected is estimated to be approximately 15. U.S. EPA is concerned that dioxin could have been formed during the incineration process at Pristine, because dioxin, an extremely toxic compound, can be formed by incomplete combustion of chlorinated organics.

- An additional round of groundwater samples will be collected from the 18 monitoring wells installed during the first phase of the RI to further characterize the groundwater quality on-site and directly off-site. The samples will be analyzed for volatile organic compounds by a Contract Laboratory Program (CLP) Laboratory.

- The groundwater sampling results will demonstrate whether there are seasonal fluctuations in concentrations and will assist in verifying the actual concentrations, because earlier samples have indicated some change in concentration over time.

- One soil boring will be performed to characterize the vertical distribution of contaminants in the unsaturated zone. The location, shown in Figure 1 (SB41), was selected on the basis of past site activities. Because chemicals were stored, treated or disposed of in this pit, it appears that it is a substantial source of contamination to the groundwater. Soil samples will be obtained continuously and retained in discrete 2.5-foot increments. Total drilling and sampling footage is estimated to be 25 feet. It may be necessary to cut through the concrete floor of the tank prior to drilling this boring. Samples will be submitted to a CLP laboratory for full HSL analysis.

- Four additional monitoring wells will be installed. The stratigraphic and hydrogeologic data needed to characterize the groundwater flow will be obtained through sampling and observation of soils during well installation.

1. A single monitoring well will be installed in the area just south of the "magic pit." This well will be approximately 35 feet deep, and will be situated in the lower lens of the upper aquifer system. In the lower lens, groundwater flows to the east. The greatest levels of contamination were found east of the magic pit, which is suspected to be a high source of contamination. The proposed monitoring well will assist in characterizing fully the contamination in the lower lens and in determining how the groundwater is flowing in this area of the site.

2. A two-well nest will be installed east of the Conrail Railroad toward the south end of the site. The shallow well is estimated to be 20 feet deep, and the deep well is estimated to be 60 feet deep. These wells are needed to determine the background concentrations in the upper outwash lens of the upper aquifer and to determine the extent of the off-site contamination in the lower lens.

3. A single monitoring well will be installed east of the Conrail Railroad toward the north end of the site. This well is estimated to be 20 feet deep. This well is also needed to define the extent of off-site contamination in the lower outwash lens.

- Soil borings will be taken where the four (4) new monitoring wells are installed.

Total drilling and sampling footage for these wells is estimated to be approximately 135 feet.

Gathering of this information will significantly assist U.S. EPA in making the proper technical determination of an appropriate cleanup action and to design and implement a cost-effective cleanup remedy.