**UNITED STATES of America, Plaintiff,**

v.

**TOWN OF MOREAU, NEW YORK, and General Electric Company, Defendants.**

**The STATE OF NEW YORK, Intervenor–Plaintiff,**

v.

**The UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and General Electric Company, Intervenor–Defendants.**

No. 88–CV–934.

United States District Court, N.D. New York.

Oct. 12, 1990.

Environmental Enforcement Section Land & Natural Resources Div. U.S. Dept. of Justice (Donald A. Carr, Paul Chassy, of counsel), Washington, D.C., for plaintiff.

Environmental Defense Section Land & Natural Resources Div., U.S. Dept. of Justice (Mary Elizabeth Ward, of counsel), Washington, D.C., for intervenor-defendant U.S. E.P.A.

Frederick J. Scullin, Jr., U.S. Atty., N.D.N.Y. (William H. Pease, of counsel), Syracuse, N.Y.

Office of Regional Counsel, U.S. E.P.A. (Bernice I. Corman, of counsel), New York City.

Michael Northridge, Office of Enforcement & Compliance Monitoring (LE–1245), U.S. E.P.A. (Pamela S. Sbar, of counsel), Washington, D.C.

Oliver & Oliver (Lewis B. Oliver, Jr., of counsel), Albany, N.Y., for Town of Moreau.

Vernon Green, Town Atty., Town of Moreau, South Glens Falls, N.Y.

Bond, Schoeneck & King (John M. Freyer, Susan Phillips Read, of counsel), Albany, N.Y., for General Elec.

Robert Abrams, Atty. Gen., State of N.Y., Dept. of Law (Michael J. Moore, Dean Sommer, of counsel), Albany, N.Y.

Environmental Enforcement New York State Dept. of Environmental Conservation (Frank Bifera, of counsel), Albany, N.Y.

## MEMORANDUM–DECISION AND ORDER

CHOLAKIS, District Judge.

■ This action concerns an area of land in the Town of Moreau, Saratoga County, known as the Caputo/Moreau landfill, the water supply of which is impacted by or threatened by the impact of hazardous substances released into the soil from 1958 to 1968 when 30 acres of the "Impact Area" were used as industrial waste disposal facility. In 1982, it was discovered that the water in the Impact Area had high levels of trichlorethylene ("TCE"). *See An Assessment of Drinking Water Quality in the Area of the Caputo Inactive Hazardous Waste Site,* Administrative Record ("AR") at 011–131 to 137.[1] The Environmental Protection Agency ("EPA") installed temporary activated carbon filter systems on the drinking water systems of 70 residences near the facility. Defendant General Electric Company ("GE"), which had deposited 452 tons of waste in the facility

---

1. The administrative record is a collection of documents upon which EPA, as the President's designated representative, makes determinations of response actions. EPA has compiled the administrative record, as required by 42 U.S.C. § 9613(k). The Court's review of the appropriateness of the Consent Decree is limited to the documents contained in the administrative record.

between 1958 and 1968, is the potentially responsible party ("PRP") under § 107 of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9607. *See* Letter from EPA to GE dated May 27, 1983, wherein EPA notified GE that it is a responsible party under CERCLA. AR at 001–2540 to 2542.

In November 1983, the EPA and GE entered into an Administrative Consent Order ("ACO"), AR at 003–1971 to 1982, wherein GE agreed to, *inter alia:* (1) take immediate temporary corrective action; (2) conduct a Remedial Investigation ("RI") "to fully define the nature and extent of contamination that constitutes the release and threatened release; (3) conduct a Feasibility Study ("FS"), an engineering study of feasible remedial alternatives, from which EPA would select a remedy to be implemented by GE; (4) perform a Remedial Design, or schedule for completion of remedial work; and (5) perform the chosen Remedial Action.[2] The ACO was subject to 30–day public commentary period, and a public information meeting was to be held.[3] The public was put on notice of the ACO on December 2, 1983. AR at 001–2162 to 2165. After the commentary period had run, during which numerous comments were made, EPA issued its response on January 27, 1984, but did not alter the ACO. AR at 001–2114 to 2121. On February 7, 1984, EPA issued letters of thanks to all who had submitted comments on the ACO. AR at 001–2081 to 2111.

GE hired Dunn Geoscience Corporation ("Dunn") to perform the Remedial Investigation ("RI") and Feasibility Study ("FS"). In October 1984, Dunn issued the RI, AR at 003–1732 to 1877, where it determined, *inter alia,* that hazardous substances were being released into the environment, and that the aquifer underneath the Impact Area was contaminated. *See* RI at 124, AR at 003–1864, where Dunn states:

The most significant aspect of contaminant distribution illustrated by the section is the tendency for TCE concentrations to be highest at intermediate and deep levels within the aquifer.

In response to a direction from EPA, an Addendum to the RI was prepared for GE by Dunn in March 1985, to study contamination at an area bounded by Cheryl Drive, Myron Road and Terry Drive in the Town of Moreau. AR at 002–1529 to 1739.

In August 1985, GE issued the FS. AR at 001–812 to 947. Dunn discussed various remedial alternatives, which included two alternatives for restoration of the aquifer. The first alternative, entitled "Source Containment, Groundwater Monitoring and Air Stripping Groundwater Discharge," has been referred to in prior motion papers as the "natural restoration" approach. AR at 001–904 to 909. First, the contaminated area, or "plume," would be sealed up by a capped slurry wall made of a combination of soil and bentonite (a claylike substance). The slurry wall would purportedly prevent the contamination from spreading, hence the term "source containment." The second step of natural restoration is groundwater monitoring, whereby the groundwater would be periodically sampled to determine whether the levels of contamination are decreasing, and whether the plume migration is changing. The final step is "air-stripping," a process whereby water is treated at its discharge point to surface waters at the Reardon Brook, in that the contaminants are removed from the water and dispersed into the air. The natural restoration alternative did not provide for treatment of the water in the aquifer. The aquifer is expected, through natural processes, to flush itself clean over time. AR at 001–916. Dunn estimated that the "duration of natural flushing will likely be on the order of decades." AR at 001–905. The natural process was expected to cost $3.2 million. AR at 001–908.

**2.** In an undated Memorandum of Understanding between EPA and the New York State Department of Environmental Conservation, EPA agreed to "review NYSDEC's submitted comments and as applicable incorporate said comments in its decisions." AR at 001–2150.

**3.** This meeting was held on December 15, 1983.

The other alternative is entitled "Source Containment, Groundwater Pumping and Recharge," and has been referred to in prior motion papers as the "active restoration" approach. AR at 001–909 to 915. This approach featured the slurry wall "source containment" from the natural restoration approach, but continued with "groundwater pumping and recharge." The water is pumped out of the aquifer and into various wells for cleaning, and then pumped back into the aquifer. Dunn could not estimate how long the active restoration method would take, but put it up into "decades" along with natural restoration. AR at 001–912. The active restoration option had advantages in that the processes were well-defined and thoroughly understood by hydrologists, and in perhaps taking less time to purify the aquifer. However, this process had its disadvantages— uncertainty as to effect on the direction of groundwater flow and the discharge at Reardon Brook, and cost—$7.9 million. AR at 001–914. The Dunn Report recommended taking the natural restoration approach to treatment of the aquifer. AR at 001–924.[4]

A lengthy public commentary period followed the issuance of the FS. The State of New York issued its concerns in a letter to EPA dated October 4, 1985. AR at 001–750 to 753. The State indicated that "the sizing of the pipes will have to be sufficiently large to reflect possible future residential expansion into the now largely vacant plume impacted area." AR at 001–750. The State strongly opposed the natural restoration approach, and concluded:

Finally, if USEPA decides to allow the General Electric Company to deal with aquifer restoration by the natural processes and the air stripper on Reardon Brook, then the State requests the USEPA to require GE to commit to installing permanent water supply to any residential areas that would be developed between Bluebird Road and Reardon Brook and periodic monitoring of the

plume to determine present conditions and movement.

AR at 001–752. The Town of Moreau issued its comments on November 26, 1985, and objected to the failure of the FS to provide for an adequate alternate water supply, as well as the alleged incorrect analysis of the number of homes affected by the contamination. AR at 001–696 to 731. The Town echoed comments made by the State concerning treatment of the aquifer. AR at 001–727 to 730.

Under the terms of the ACO, EPA was to select a remedy for treatment of the Impact Area, and put it in a document known as a Record of Decision ("ROD"). In a letter to EPA dated January 14, 1986, the State indicated its concern that a ROD would issue which would fail to address adequately aquifer restoration. AR at 001–574 to 576. As the letter indicates, EPA via telephone had notified the State that it would select natural restoration in the ROD. In the State's opinion, "[t]he agreement which USEPA intends to conclude with General Electric Co. will, in essence, leave a once productive aquifer unusable, essentially forever." AR at 001–574. The State further commented:

It should also be recognized that the institutional controls on aquifer use, i.e. G.E.'s proposal to provide for a public water supply to all areas of the town impacted by its contaminant plume, do not completely address the "human exposure" and future development issues......

Please make certain that the Record of Decision reflects the realities involved in USEPA's settlement, i.e., the complete loss to New York of a vital aquifer system, the continued groundwater violations, and the need to monitor the health and environmental conditions in the plume area, so that future hazardous waste polluters are not under the impression that the installation of a public wa-

---

**4.** The entire recommended remedial action plan featured (1) Air stripping at Reardon Brook; (2) Provision of a water supply pipeline to the affected homes within the Impact Area; (3) Slurry wall; (4) Groundwater Monitoring; (5) and Excavation and onsite disposal of contaminated soil. AR at 001–925.

ter supply is all that is needed to resolve hazardous waste site conditions. AR at 001–575. EPA answered this letter on February 4, 1986, in an attempt to "correct the erroneous record" apparently created by the prior letter. AR at 001–468 to 470. EPA had previously agreed at a meeting with the State in New Paltz that "EPA in its Record of Decision will insert language stating that the aquifer has been damaged, and that the work under the Order does not require General Electric to address aquifer restoration." AR at 001–468. EPA continued:

> With respect to a statement about future development, you should be aware that General Electric has agreed and *will be ordered* to provide sufficient water for future development. They agreed to this several months ago, and that agreement was reiterate[d] at several meetings with State officials.

*Id.* (Emphasis added).[5]

The State responded on February 18, 1986, stating that it awaited receipt of the ROD, and that EPA had previously been notified of groundwater contamination at levels in excess of New York regulations. AR at 001–577 to 578. At some point in 1986, EPA indicated its intention to choose the natural restoration approach in an Enforcement Decision Document ("EDD").[6] In a letter to EPA dated July 8, 1986, the State indicated that the EDD did not provide that the groundwater remained contaminated at levels well in excess of New York regulations. *See* Exhibit 7 of State of New York's Motion to Intervene, filed June 8, 1989.[7] The State concluded: "This

letter along with my October 4, 1985 letter to you clearly identifies the State's concerns and position regarding this site." *Id.,* at 2. The State made its position clear that it strongly opposed the natural restoration option, and a compromise was apparently reached. In June 1987, a revised EDD was issued, which required GE, along with the natural restoration option, to build a public water distribution system for 120 current residences, with the water supply coming from the Village of South Glens Falls. *See* Exhibit 8 of State of New York's Motion to Intervene. The alternate water supply was considered by the State as a replacement for the aquifer. With respect to future· development, the revised EDD provided "GE has offered, and EPA will allow, for the provision of public water to currently undeveloped areas within the plume of contaminated water should these areas undergo development in the future." Revised EDD at 2, AR at 015–0041.[8] The revised EDD contained the following additional language under the subheading "Objectives":

> The most important objective of the proposed remedial actions is to provide a safe drinking water supply for residents whose drinking water wells have been adversely impacted by groundwater contamination emanating from the GE Moreau site. *This includes the provision of a safe water supply for future development in currently undeveloped areas where groundwater contamination also exists.*

---

**5.** The position taken by EPA in the February 4, 1986 letter is in stark contrast to that taken in an internal office memorandum dated July 7, 1987, which is that "EPA is powerless to *order* G.E. to take care of future development needs; moreover, it is powerless to order G.E. to comply with its own offer." AR at 014–0012. (Emphasis in the original). The February 4, 1986 letter indicates quite clearly that EPA would order GE to comply with its offer.

**6.** Up to this point, EPA had fastidiously maintained all documents in the Administrative Record. However, at what in this Court's judgment is a critical point in the record, certain documents are conspicuous by their omission. The EDD is not provided in the Administrative

Record, and only one page from the revised EDD has been included. AR at 015–0041. The State of New York provided a copy of the entire revised EDD in their prior intervention motion papers. The reference to the revised EDD as the "draft ROD" in a June 29, 1989 letter from Melvin Hauptmann to the file is interesting, considering the State's lack of concurrence with the ROD. AR at 015–0045, par. 3.

**7.** This letter has also been omitted from the Administrative Record.

**8.** As previously stated in footnote 6, this is the only page from the revised EDD which was included in the Administrative Record.

Revised EDD at 7, Exhibit 8 of State of New York's Motion to Intervene. The State concurred with the revised EDD in a letter dated June 22, 1987:

> The State of New York has reviewed the revised Enforcement Decision Document (EDD) for the GE Moreau site, dated June 8, 1987. The revised EDD reflects the concerns previously transmitted to your agency regarding institutional controls and provisions for GE to provide public water to undeveloped areas within the contaminated plume. We, therefore, concur with the revised EDD *as written.*

AR at 001–0021 and 015–0042. (Emphasis added).[9] The State's position is that it concurred with the revised EDD with the understanding that GE would supply public water to as-yet undeveloped areas within the Impact Area.

On July 13, 1987, EPA issued the ROD, AR at 011–0001 to 0038, which purported to be a copy of the revised EDD. However, the language concerning the provision of water to undeveloped areas as they develop was deleted. AR at 011–0002. Furthermore, the sentence from the "Objectives" portion of the revised EDD was also deleted. AR at 011–0007. No explanation for the removal of language which prompted the State's concurrence with the revised EDD has been proffered by EPA. The ROD continues by stating that "The State of New York has been consulted and agrees with the approved remedies." AR at 011–0003. The Administrative Record, for all intents and purposes, is apparently completed upon the issuance of the ROD.

GE was unable to enter Town property to perform the alternate water supply provision of the remedy chosen by EPA in the ROD, because the Town refused to let them on the property, and threatened GE with trespass actions. The Town refused to acquiesce in GE's entrance on its land to build the system, claiming (1) that the area which the system would cover was too small; (2) the quality and quantity of water supply from South Glens Falls is or would become substandard; and (3) EPA and GE had failed to obtain necessary permits for the construction.

EPA, as the authorized representative of plaintiff United States of America, thereafter brought suit on two grounds: (1) against the Town of Moreau for an Order Granting Immediate Access pursuant to CERCLA § 104(e)(3), 42 U.S.C. §§ 9604(e)(3) & (5); and (2) against GE for an order directing GE to proceed with the balance of the response action, pursuant to CERCLA § 106(a), 42 U.S.C. § 9606(a). The Town was named an indispensable party defendant in the § 106 claim, pursuant to Fed.R.Civ.P. 19. On September 7, 1988, the Court issued an Order to Show Cause why the Order Granting Immediate Access should not be granted. On September 16, 1988, the Court heard oral argument on the Order to Show Cause. The Town argued that immediate access could not be granted because EPA/GE had failed to obtain permits from the New York State Departments of Health and Environmental Conservation. While it appeared that the reason the permits were not granted was the Town's refusal to approve the response measures, the issue focused on was whether permits were necessary at all. CERCLA § 121(e)(1), 42 U.S.C. § 9621(e)(1) provides:

> No Federal, State, or local permit shall be required for the portion of any removal or remedial action conducted entirely *onsite,* where such remedial action is selected and carried out in compliance with this section.

(Emphasis added). The Court determined that the Town property within the Myron Road, Terry Drive and Cheryl Drive area was "onsite," thereby making permits for the work to be performed in that area unnecessary. At the time the Court's decision was made, the relevant authority was the plain meaning of the statute, along with the following cases: *Dickerson v. Administrator, EPA,* 834 F.2d 974, 977 (11th

---

9. In a letter dated May 14, 1987, the State concurred with a U.S. Geological Survey ("USGS") Report, which found that the Village of South Glens Falls water supply was sufficient in quantity and quality to provide for the homes in the Impact Area. AR at 015–0043. The USGS Report has been included in the Administrative Record at 011–0039 to 0051.

Cir.1987); *United States v. Charles George Trucking Co., Inc.,* 682 F.Supp. 1260, 1267 (D.Mass.1988); *United States v. Long,* 687 F.Supp. 343, 344 (S.D.Ohio 1987); *United States v. Iron Mountain Mines, Inc.,* No. S–87–1189, slip op. at 1, 1987 WL 46792 (E.D.Cal. Sept. 18, 1987) (Exhibit G of EPA's Motion Papers); *United States v. Western Processing Company,* 751 F.Supp. 902 at 905 (W.D.Wash.1986) (Exhibit E of EPA's Papers). The Court granted EPA's motion for an Immediate Order in Aid Of Access, which also included an injunction against the Town's interference with GE's efforts, and signed the proposed order.[10] As such, the first cause of action was fully resolved.[11]

Along with the papers in support of the Immediate Access Order, EPA included a Consent Decree which purported to resolve the § 106 action. While the Court initially entered the Consent Decree, it is clear that such entry was improper, as the public commentary provisions of CERCLA § 122(d), 42 U.S.C. § 9622(d), had been violated. On October 20, 1988, the Court reserved decision on the Town's motion to vacate the Consent Decree, and directed that the provisions of CERCLA § 122 be complied with.[12] In accordance with CERCLA § 122(i)(1), 42 U.S.C. § 9622(i)(1), notice of the lodging of the Consent Decree was published in the Federal Register on March 21, 1989. 54 Fed.Reg. 11573. Extensions of time have been granted so that comments on the Consent Decree could be made. Comments have been received from the State and the Town, and EPA and GE have responded thereto.

The Court's review of the Consent Decree is a limited one, and the Consent Decree must be enforced if it is reasonable, fair and consistent with CERCLA's goals. *United States v. McGraw–Edison Company,* 718 F.Supp. 154, 158 (W.D. N.Y.1989); *State of New York v. Town of Oyster Bay,* 696 F.Supp. 841, 843 (E.D.N. Y.1988). While the Court cannot act as a "rubber stamp" for the Consent Decree, the Court cannot review the proposed settlement *de novo.* *United States v. Cannons Engineering Corp.,* 899 F.2d 79, 84 (1st Cir.1990); *See also City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 462 (2d Cir. 1974). The Court's task "is to determine whether the settlement represents a reasonable compromise, all the while bearing in mind the law's generally favorable disposition toward the voluntary settlement of litigation and CERCLA's specific preference for such resolutions." *United States v. Rohm & Haas Company,* 721 F.Supp. 666, 680–681 (D.N.J.1989). Factors for the Court to consider are (1) the strength of the Government's case; (2) the good faith efforts of the negotiators; (3) opinions of counsel; and (4) the possible risks involved in litigation if the settlement is not approved. *City of New York v. Exxon Corp.,* 697 F.Supp. 677, 692 (S.D.N.Y.1988); *United States v. Hooker Chemicals & Plastics Corp.,* 540 F.Supp. 1067, 1072 (W.D.N.Y. 1982).

While the Court's review is akin to the Administrative Procedure Act's "arbitrary and capricious" standard, *United States v. Ottati & Goss, Inc.,* 900 F.2d 429, 434 (1st Cir.1990),[13] the Court cannot ap-

---

**10.** This order was later amended to reflect more closely the letter of the Immediate Access statutes.

**11.** On the date the Court granted the Order in Aid of Immediate Access, GE did not have a contract for the sale of water from the Village of South Glens Falls. However, this fact was not brought to the Court's attention by any party until after the Court's decision was rendered.

**12.** Due to intervening motions dealing with the availability of water from the Village of South Glens Falls, the Court did not sign an order reflecting the October 20, 1988 bench ruling

until February 14, 1989. *See* Transcript from Proceedings on December 2, 1988, at 51.

**13.** In its recent decision in *Ottati & Goss,* the First Circuit took the position that if an action is a CERCLA § 106(a), *first sentence* action, a district court is not limited to the usual arbitrary and capricious standard. 900 F.2d at 432. The second cause of action, which the Consent Decree purports to settle, is brought pursuant to § 106(a) of CERCLA, and seeks immediate injunctive relief. Thus, an argument can be made that this action, like the *Ottati & Goss* action, is a § 106(a), first sentence, action, and not subject to the usual standard of review. In light of the fact that the Consent Decree stems from the

prove of a Consent Decree where the agreement is "illegal, a product of collusion, inequitable, or contrary to the public good." *Kelley v. Thomas Solvent Company*, 717 F.Supp. 507, 515 (W.D.Mich.1989). Likewise, EPA may not "mislead any of the parties, discriminate unfairly, or engage in deceptive practices," nor may it "spoon feed PRP's." *United States v. Cannons Engineering Corp.*, 899 F.2d 79, 93 (1st Cir.1990). The Court's review of the Consent Decree is limited to the Administrative Record, *United States v. Wastecontrol of Florida, Inc.*, 730 F.Supp. 401, 405 (M.D.Fla.1989), and that review is discretionary with the trial court. *United States v. Hooker Chemical & Plastics Corp.*, 776 F.2d 410, 411 (2d Cir.1985).

The Court has thoroughly reviewed the comments filed by the Town and the State, the responses to the comments received from EPA and GE, the voluminous documents included in the Administrative Record, and documents that for no apparent reason were omitted from the Administrative Record. EPA emphatically argues that this case is a very narrow one, and that the only matter before the Court is whether that portion of the remedy dealing with the alternate water supply is proper. EPA argues that the State and Town are trying to expand the case to cover irrelevant matters. In this Court's judgment, the Moreau aquifer is not an irrelevant matter, and is inextricably intertwined with the alternate water supply issue.

The State made it clear well prior to the issuance of the ROD that the Moreau aquifer was contaminated at levels well in excess of state regulations. EPA responded that it would not, although it could, order GE to remedy the contamination in the aquifer. The State concurred with an alternate water supply as a means of aquifer replacement, since EPA would not order aquifer treatment. EPA informed the State that it would order GE to comply with its offer to provide for future develop-

ment in the Impact Area. The issue of whether EPA had the power to make such a representation is irrelevant, since such a representation was made, and it effectuated a concurrence from the State. The revised EDD, while written in permissive language, contained language that was removed without explanation from the ROD. The removed language, in this Court's judgment, was the cornerstone of the State's concurrence with the proposed remedy. The Court can only surmise as to the motivating factors behind such deletions, as EPA has provided no explanations. The State made it clear that it concurred with the revised EDD *as written*. The ROD is not the revised EDD *as written*, and the statement by EPA that the State concurs with the remedy selected is inaccurate.

■ The failure to provide certain documents in the Administrative Record is also a troubling matter. While the Court acknowledges that its review is limited to the Administrative Record, the Court cannot enter a Consent Decree based on an incomplete record that gives the appearance of selective omissions.

EPA also argues that it cannot order GE to provide for future development within the Impact Area, as CERCLA only speaks to past contamination and present remediation. In this Court's judgment, the Moreau aquifer is *presently* contaminated. The State's concern over the present contamination at the aquifer was purportedly placated by statements that EPA could order GE to provide for future development. Because of these statements, and language in the revised EDD which the State understood as providing for the future, the State abandoned its prior position that the EPA's position concerning aquifer restoration was inadequate.

■ Despite the law's preference for voluntary settlements of CERCLA actions, this Court cannot approve this Consent Decree. The Court is of the opinion that EPA

---

1983 ACO, and seeks implementation of part of a remedy chosen in a 1987 ROD, the Court fails to see the emergency situation envisioned by the First Circuit. As the Circuit stated, § 106(a), first sentence, "seems more plausibly applicable

to an emergency situation, where the agency has not yet had time to compile a thorough record and to issue an 'order.'" *Ottati & Goss*, 900 F.2d at 434.

may have misled the State into concurring with the revised EDD, which was a crucial portion of the negotiation process between EPA and the State. While the Court commends EPA for granting the Town due process (even when such process may not have been due), the same cannot be said for their negotiations with the State. The Court furthermore is at a loss to explain why crucial documents were omitted from the Administrative Record, as well as why crucial language was omitted from the ROD. Without any explanation from EPA, the Court can only determine that these omissions were, at best, arbitrary. After a thorough review of the voluminous documents in the file, it is hereby

ORDERED, that the Consent Decree is vacated, and it is further

ORDERED, that the State of New York's motion for partial summary judgment is stricken from the Court's November 2, 1990 motion calendar, subject to renewal by the State after a review of this Memorandum–Decision and Order.