**MONTEREY BAY UNIFIED AIR POLLUTION CONTROL DISTRICT FOR THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff,**

v.

**UNITED STATES DEPARTMENT OF THE ARMY and United States Department of Defense, Defendants.**

**No. 99–CV–20485–RMW.**

United States District Court, N.D. California.

March 13, 2001.

David P. Schott, District Counsel, Monterey, CA, Thomas H. Clarke, Jr., Ropers, Majeski, Kohn & Bentley, Redwood City, CA, for plaintiff.

Thomas H. Pacheco, Environmental Defense Section, U.S. Department of Justice, San Francisco, CA, for defendants.

## ORDER RE MOTIONS FOR SUMMARY JUDGMENT

WHYTE, District Judge. ·

The cross-motions for summary judgment in this matter, brought pursuant to Rule 56 of the Federal Rules of Civil Procedure, were heard by the court on September 1, 2000. The court has read the moving and responding papers [1] and heard the argument of counsel. For the reasons set forth below, the court grants the District's motion regarding jurisdiction and denies the Army's counter-motion, grants summary judgment in favor of the Army and against the District with respect to the Army's alleged breach of the parties' Settlement Agreement except as to the claims arising from the burn conducted on September 18, 1998 as to which there are genuine issues of material fact and denies the District's motion with respect to the other issues it raises.

## I. BACKGROUND

This is an environmental dispute between the Monterey Bay Unified Air Pollution Control District ("the District") and the United States Departments of Defense and of the Army (together, for simplicity's sake, "the Army").

This case is one of several that have been filed against the Army for the environmental cleanup of the former Fort Ord military reservation. *See, e.g., Fort Ord Toxics Project v. California Envtl. Protection Agency,* 189 F.3d 828 (9th Cir.1999). Fort Ord is a 28,000-acre former Army installation, most recently used as a training and staging facility for infantry troops.

On July 23, 1990, the Army, the United States Environmental Protection Agency, the California Department of Toxic Substances Control ("DTSC"), and the Regional Water Quality Control Board entered into a Federal Facilities Agreement ("FFA") under CERCLA Section 120, 42 U.S.C. § 9620, to remediate environmental damage at the former Fort Ord. The FFA requires the Army to complete remedial investigation and feasibility studies, undertake response actions, and operate and maintain response actions. (Byrne Decl. Ex. A. ¶ 6.2.) The FFA also creates a procedure for state involvement in the Army's environmental cleanup, including the identification and integration of state applicable or relevant and appropriate requirements into the remedial process. (*Id.* ¶ 7.6.)

This case involves the burning of vegetation at certain ordnance firing ranges so that it will be easier to locate and remove unexploded ordnance and explosives ("OE").[2] In the past, children have gone

---

1. The court has considered the reply papers filed by the Army, because they were filed in accordance with Civil Local Rule 7–3(d) (authorizing reply papers in support of counter-motion when filed at least 14 days before hearing date).

2. Some of the material being cleared is weapons-grade ordnance; some of it consists of dye-filled dummy shells.

on to these ranges and stolen unexploded, dye-filled ordnance and used it to vandalize a school. (Willison Decl. ¶ 6.) The ranges were later fenced, but access is still possible to determined intruders. The State of California has expressed continuing concern to the Army about the danger posed by the OE. (Willison Decl. at ¶ 9.)

The prescribed burns are used only to clear vegetation prior to actual clearance of the OE and not for the disposal of OE itself. (Siemann Decl. ¶ 4.) According to the Army, burning is used in areas where it is safer than using mechanical means to clear maritime chaparral and other types of dense vegetation found on portions of Fort Ord. (Id. ¶ 5.) Maritime chaparral consists of extremely dense vegetation that severely limits visibility of the ground below the vegetation. Because these areas contain unexploded ordnance, clearing the vegetation using machinery presents the potential for detonation of ordnance where crews are working.

According to the Army, mechanical vegetation removal systems are not capable of maneuvering on the more rugged sections of Fort Ord or leave too much debris covering the ground and obscure the OE, preventing its detection and removal. (Id.) Additionally, the Army claims that controlled burning is beneficial to the chaparral habitat in which several threatened and endangered species exist such as the Sand Gilia, Monterey Spineflower, Seaside Bird's Beak, and several species of rare shrubs. Indeed, the Army claims that mechanical clearance means might cause harm to these endangered species, causing it to violate its Habitat Management Plan, which was implemented under the Endangered Species Act. (Siemann Decl. ¶ 6.)

Burns conducted by the Army result in the generation of smoke. Like all smoke,

the smoke released during the prescribed burns is composed of carbon dioxide, carbon monoxide, nitrous oxides, sulfur dioxide, volatile organic compounds and polycyclic aromatic hydrocarbons in the form of particulate matter.[3] (Byrne Decl. Ex. G at 9.) The smoke also contains small particulate matter known as PM10 (particulate matter with a diameter of less than 10 microns), which is easily inhaled into the deepest parts of the lung and can cause adverse health consequences, particularly for children, the elderly, and people with respiratory conditions. (Id.)

On October 16, 1997, in response to the Army's burning activity, the District initiated litigation against the Army in the Superior Court for the County of Monterey ("the 1997 action"). The Army removed the action to this court. In June 1998, the District and the Army settled the 1997 action by entering into a settlement agreement ("the Settlement Agreement"). (Byrne Decl. Ex. C) The stated purpose of the Agreement was to settle any dispute between the District and the Army. (Id.) The Agreement provides:

> The District and the United States agree that the ordnance removal project should continue so as to provide for the rapid conveyance of Fort Ord properties to local governments, that the project must not result in harm to the health and welfare of the citizens of the North Central Coast air basin ... Prior to each burn, the Army will prepare an operational burn plan. That plan will be developed in coordination with representatives of the California Department of Forestry, the District and such other appropriate agencies at the Army's discretion. The plans shall be submitted to the District seven (7) days before each

---

**3.** The District does not claim that the smoke released during the prescribed burns at Ford Ord has any uniquely harmful properties.

anticipated burn. The District will return its comments to the Army no less than four (4) days before the anticipated burn.

(*Id.* at pg. 2, ¶ 3. A and B). The Settlement Agreement also placed specific restrictions on the amount of acreage that the Army could burn on any given day as determined by the atmospheric mixing depth forecast for the day. Specifically, the Agreement states:

D. Burn Day determinations shall be made using the following criteria:

1. For burns of less than 50 acres, an affirmative burn day determination will be made where the mixing depth is forecast to be at least 1200 feet above the ground level.

2. For burns of 51 acres to 125 acres, an affirmative burn day determination will be made where the mixing depth is forecast to be at least 1350 feet above ground level . . . .

3. For burns of 126 acres and higher, an affirmative burn day determination will be made where the mixing depth is forecast to be at least 1500 feet above ground level.

\* \* \* \* \* \*

F. The Army shall consult with the District, on the day of the burn, prior to burning regarding meteorological conditions and other matters for any burn between 126 and 200 acres.

\* \* \* \* \* \*

H. On the day of the burn, the mixing depth must be forecast to reach a minimum number of feet consistent with the burn day determination required in Paragraph D above before the burn is commenced. This forecast will be made by either the District or the Army.

I. For burns of 40 acres or less, where the effective mixing depth is forecast to be below 100 feet of that required by Paragraph D. 1, the District may give permission for the burn to take place at its sole discretion.

\* \* \* \* \* \*

K. The Army agrees that no burn will begin at a time that the wind direction is toward Marina, Seaside or Del Rey Oaks.

(*Id.* ¶¶ D, F, H, I and K). The Settlement Agreement also addressed actions the Army was to take during every burn. Specifically, the Agreement, states:

O. The Army agrees to station an observer downwind of the burn to determine if a smoke plume touches down off Fort Ord property.

P. Should a smoke plume touch down outside the boundaries of Fort Ord, or should fire escape its intended boundaries, the Army will immediately notify . . . Monterey County Office of Emergency Services, the cities of Marina, Seaside, Salinas and Monterey, appropriate neighborhood associations, the Salinas Rural Fire Department . . . and will take whatever actions are possible to extinguish the fire.

(*Id.* ¶¶ O, P). The Settlement Agreement also obligated the Army to "obey applicable substantive requirements of the District or any other regulatory agency, including creating a nuisance." (*Id.* ¶ Q).

On September 16, 17, 18 and 23, 1998, the Army conducted burns. (Byrne Decl. Ex. D) Each of these events resulted in smoke drifting beyond the boundaries of Fort Ord. (*Id.*) The District received numerous complaints from citizens about the smoke. (Byrne Decl. Ex. D, E, F, and H) The Army intends to conduct additional burns at Fort Ord. (*Id.* Ex. D at 15.) The Army anticipates that its burning activity at Fort Ord will proceed for a number of years. (*Id.* Ex. J) The Army has not sought a permit from the District for the prescribed burns.

Plaintiffs filed the current complaint on May 28, 1999, challenging the legality of the September 1998 burns and seeking an injunction against future burns and civil penalties. Specifically, the District seeks civil penalties under California Health and Safety Code Section 42402 *et seq.*, injunctive relief under the citizens suit provisions of the Clean Air Act and CERCLA, and enforcement of the Settlement Agreement and FFA by writ of mandate.

## II. LEGAL STANDARD

Rule 56(c) of the Federal Rules of Civil Procedure requires that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers or interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The court may grant summary judgment as to entire causes of action, or summary adjudication as to specific issues only.

A party seeking summary judgment must first meet an initial of production and show that there are no genuine disputes of material fact. If the movant does not bear the ultimate burden of persuasion, it need only point to the record and note the absence of material facts that the nonmovant would need to prove at trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant meets its initial burden, the burden then shifts to the other party to produce admissible evidence that would allow a reasonable finder of fact to reach a verdict in his favor, as viewed under the appropriate burden of proof. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 254, 106 S.Ct. 2505, 91 L.Ed.2d

202 (1986). The admissible evidence that the nonmovant produces must be evidence of "specific facts." Fed.R.Civ.P. 56(e). The court construes all evidence, and draws all logical inferences therefrom, in the light most favorable to the non-moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

When deciding issues of jurisdiction, however, the court is not bound by the strictures of Rule 56. "A district court may hear evidence and make findings of fact necessary to rule on the subject matter jurisdiction question prior to trial, if the jurisdictional facts are not intertwined with the merits." *Rosales v. United States,* 824 F.2d 799, 803 (9th Cir.1987); *see United States ex rel. Biddle v. Stanford,* 161 F.3d 533, 535 (1998) ("In making its determination, the district court may resolve factual disputes based on the evidence presented where the jurisdictional issue is separable from the merits of the case.").

## III. ANALYSIS

The parties cross-move for summary judgment on the jurisdictional issue[4] of whether the Army's OE clearance efforts are a "removal" or "remedial" action, as those terms are used in CERCLA. The parties further cross-move for summary judgment on the issue of whether the Army has breached the Settlement Agreement. Finally, the District moves for summary judgment on the following issues: (1) that the Army's burning activities have created a nuisance, (2) that the Army has unlawfully failed to secure a permit for its burning activities; (3) that the District is entitled to civil penalties for air quality

---

**4.** It is something of a misnomer to refer to the jurisdictional motions as "summary judgment" motions, because, as noted, even genuine disputes of material fact will not preclude resolution of the jurisdictional issue. The parties do not contend that the jurisdictional issue is inseparable from the merits.

violations by the Army; and (4) that the District is entitled to injunctive relief under CERCLA and the Clean Air Act.

## A. SUBJECT-MATTER JURISDICTION UNDER CERCLA

■ CERCLA provides a limited waiver of the United States' sovereign immunity for challenges to cleanups at federal facilities. *See* 42 U.S.C. § 9659 (authorizing citizen suits to enforce the provisions of an FFA). Section 113(h) of CERCLA defines the jurisdiction of the federal courts in such actions. Specifically, Section 113(h)(4) authorizes

> [a]n action under section 9659 of this title (relating to citizens suits) alleging that the removal or remedial action taken under section 9604 of this title or secured under section 9606 of this title was in violation of any requirement of this chapter. Such an action may not be brought with regard to a removal where a remedial action is to be undertaken at the site.

42 U.S.C. § 9613(h). The Ninth Circuit has construed this proviso to block challenges to CERCLA removal actions, that is, response actions conducted pursuant to the President's authority under CERCLA Section 104, 42 U.S.C. § 9604. However, Section 113(h) does not bar actions challenging remedial actions conducted pursuant to the President's authority under CERCLA Section 120, 42 U.S.C. § 9620.

Thus, a key issue in any challenge to an environmental response on federal land is whether the response is best characterized as a "remedial" or "removal" response. These terms are defined in CERCLA Section 101:

> (23) The terms "remove" or "removal" mean[ ] the cleanup or removal of released hazardous substances from the environment, such actions as may be necessary taken in the event of the threat of release of hazardous substances into the environment, such actions as may be necessary to monitor, assess, and evaluate the release or threat of release of hazardous substances, the disposal of removed material, or the taking of such other actions as may be necessary to prevent, minimize, or mitigate damage to the public health or welfare or to the environment, which may otherwise result from a release or threat of release. The term includes, in addition, without being limited to, security fencing or other measures to limit access, provision of alternative water supplies, temporary evacuation and housing of threatened individuals not otherwise provided for, action taken under section 9604(b) of this title, and any emergency assistance which may be provided under the Disaster Relief and Emergency Assistance Act [42 U.S.C. § 5121 et seq.].
>
> (24) The terms "remedy" or "remedial action" mean[ ] those actions consistent with permanent remedy taken instead of or in addition to removal actions in the event of a release or threatened release of a hazardous substance into the environment, to prevent or minimize the release of hazardous substances so that they do not migrate to cause substantial danger to present or future public health or welfare or the environment. The term includes, but is not limited to, such actions at the location of the release as storage, confinement, perimeter protection using dikes, trenches, or ditches, clay cover, neutralization, cleanup of released hazardous substances and associated contaminated materials, recycling or reuse, diversion, destruction, segregation of reactive wastes, dredging or excavations, repair or replacement of leaking containers, collection of leachate and runoff, onsite treatment or incineration, provision of alternative water supplies, and any

monitoring reasonably required to assure that such actions protect the public health and welfare and the environment. The term includes the costs of permanent relocation of residents and businesses and community facilities where the President determines that, alone or in combination with other measures, such relocation is more cost-effective than and environmentally preferable to the transportation, storage, treatment, destruction, or secure disposition offsite of hazardous substances, or may otherwise be necessary to protect the public health or welfare; the term includes offsite transport and offsite storage, treatment, destruction, or secure disposition of hazardous substances and associated contaminated materials.

42 U.S.C. § 9601(23)-(24). The Ninth Circuit has summarized the distinction as follows:

[R]emoval actions are temporary measures taken to protect against the threat of an immediate release of hazardous substances into the environment, whereas remedial actions are intended as permanent solutions.

*Fort Ord Toxics Project*, 189 F.3d at 834.

There are no reported cases setting forth tests for distinguishing "remedial" from "removal" actions in the specific context of determining jurisdiction under Section 113(h). This is not surprising, because before the Ninth Circuit's decision in *Fort Ord Toxic Project*, no court had construed the terms to have this jurisdictional effect. *See Fort Ord Toxic Project*, 189 F.3d at 832, 834 (noting that attaching jurisdictional significance to the removal/remedial distinction is "intuitively unappealing" but holding that "the statutory language seems to require it.").

The parties cite numerous cases from other contexts interpreting whether a particular response action is remedial or removal. These authorities are difficult to reconcile. Much of the confusion in the case law stems from the circularity of the statutory definitions.[5] Anytime one is removing a hazardous substance, one is presumably remedying the environmental problem that the substance is causing. (And conversely, it is difficult to imagine an effective remedy for a hazardous waste site that does not involve removing the hazardous waste.) At least one court has even suggested that some response actions may properly be classified as *both* removal *and* remedial responses. *See Hatco Corp. v. W.R. Grace & Co.-Conn.*, 849 F.Supp. 931, 962 (D.N.J.1994).

Because the precise distinction between "remedy" and "removal" is elusive, and is based on numerous factual inquiries, several courts have declined to resolve this issue on summary judgment. *See Tri–County Business Campus v. Clow Corp.*, 792 F.Supp. 984, 993 (E.D.Pa.1992) (citing other unpublished cases). However, given that the removal/remedial distinction in this case has jurisdictional significance, and is not intertwined with the merits of the District's case, the court must resolve this issue before it can reach any other questions.

The court concludes that the Army's cleanup of OE is most appropriately characterized as a remedial action. As the District notes, the government's effort has been proceeding for six years and is part of a broader plan to effect a permanent solution. Both these factors weigh strongly in favor finding that the OE clearance is a remedial response. *See Fort Ord Toxics Project*, 189 F.3d at 834 (remedial respons-

---

**5.** The court is not the first to notice the difficulties presented by this distinction. *See generally* Jerry L. Anderson, *Removal or Remedi-*

*al? The Myth of CERCLA's Two–Response System*, 18 Colum. J. Evtl. L. 103 (1993).

es are permanent solutions); *Sherwin–Williams Co. v. City of Hamtramck,* 840 F.Supp. 470, 475–76 (E.D.Mich.1993) (holding that eight-year cleanup activity was too "extended and protracted" to be a removal action); *see also* 40 C.F.R. § 300.415(b)(5) ("CERCLA fund-financed removal actions, other than those authorized under section 104(b) of CERCLA, shall be terminated after $2 million has been obligated for the action or 12 months have elapsed from the date that removal activities begin on-site . . . .").[6]

The Army notes that neither of these factors—duration or finality of the measure being adopted—is decisive, and argues that the OE presents an imminent threat to the community, rendering the clearance activities a removal action. While the court does not wish to minimize the danger from the OE, the primary concern relates to trespassers who could possibly circumvent the Army's fencing and other security measures the Army chooses to undertake. This is not a situation where merely leaving the hazardous waste on the ground is likely to lead to air or water contamination. Thus, while clearing OE is obviously a beneficial activity, it cannot fairly be said that this is a situation in which "there is no time to safely conduct [detailed] review due to the exigencies of the situation," such that the OE clearance should be deemed a removal response. *Channel Master Satellite Sys., Inc. v. JFD Elecs. Corp.,* 748 F.Supp. 373, 386 (E.D.N.C.1990). To be sure, every hazardous waste causes some risk of harm (otherwise it would not be "hazardous"), but the removal/remedial distinction turns on the immediacy of such harm. The court is persuaded that the risk is not so immediate here that the Army's response should be classified as a "removal" action insulated from judicial review.[7] The court is mindful of the Army's evidence of limited resources, particularly the limitation of qualified people to do the work. However, the court also finds significant the over six years that the response has been going on, the fact that there has apparently not been a burn since 1998 and the fact that additional security measures would likely minimize the risk of trespassing by even the most venturesome and bold trespassers. Further, the same unexploded ordnance remained on the land without incident while the land was functioning as a military base.

The Army also argues that holding that the OE clearance is a remedial action will expose the program to interference and delay, because the Army may face legal challenges based on its failure to comply with the more detailed procedural requirements for remedial actions. According to the Army, any such delay will further endanger the lives of local children.

While the court is sympathetic with the Army's concerns, the Army has had several years to clear the necessary procedural hurdles. The EPA regulation cited above contemplates a one-year time frame for the typical removal action; it is therefore not unreasonable to expect the Army to be

---

**6.** This cited EPA regulation (40 C.F.R. § 300.415(b)(5)) is not directly applicable to the instant case, because the OE clearance activities are not funded from the Superfund. However, the EPA's expert view that removal actions are generally subject to a 12 month/$2 million limit is entitled to considerable deference.

**7.** The court is also not persuaded the Army's internal classification of the prescribed burns as a "time-critical removal action" should affect the court's analysis of this issue, because it directly affects the subject-matter jurisdiction of this court. *See In re Parker N. Am. Corp.,* 24 F.3d 1145, 1149 (9th Cir.1994) (reviewing jurisdictional issue *de novo* because "Congress did not commit questions of court access . . . to the [agency].").

ready to proceed with a remedial action in less than six years. The court also notes that the Army does not (and for that matter, should not) endanger the lives of local children if the OE clearance activities are blocked by legal challenge; under CERCLA Section 9601(23), the Army has clear authority to block off the affected sites with guards and fences, without any threat of outside interference. *See* 42 U.S.C. § 9601(23) (including "security fencing or other measures to limit access" within the definition of removal actions).

The court accordingly concludes that for jurisdictional purposes the prescribed burns at Ford Ord are part of a remedial response action and are, therefor, subject to challenge under 42 U.S.C. § 9659. The court now turns to the remaining issues.

**B. WHETHER THE ARMY HAS BREACHED THE SETTLEMENT AGREEMENT**

█ The District contends that the numerous citizen complaints it has received about the Army's prescribed burns demonstrate that the burning activities are a nuisance under California law. According to the District, the Army is prohibited from creating a nuisance under the Federal Facility Agreement, which was reaffirmed by the Settlement Agreement. Accordingly, the District argues, the Army is breaching the Settlement Agreement.

This argument lacks merit. The Settlement Agreement contains detailed restrictions on the burning activities that the Army may conduct. With only one exception (discussed below), the District produces no evidence that the Army has not complied with the various restrictions con-

tained in the Settlement Agreement, which limit burns based on acreage and atmospheric depth conditions.

As a party to a detailed framework under which the Army may conduct burns, the District may not seek relief for the environmental ill effects that may result despite the Army's good faith compliance with the specific requirements of the Settlement Agreement. While the Settlement Agreement does contain a general statement that nothing therein authorizes the Army to "creat[e] a nuisance," that provision must be read in the light of the Settlement Agreement as a whole, which provides objective guidelines for prescribed burns.[8] Under California contract law, a contract must be interpreted as a whole. *See* Cal. Civ.Code § 1641. Moreover, the specific provisions of a contract (here, the provisions of the Settlement Agreement authorizing prescribed burns as long as certain conditions are met) control general language (here, the general statement that the Army is not authorized to create a nuisance). *See* 1 B.E. Witkin, *Summary of California Law* (Contracts) § 695(a) (9th ed.1987). To construe the Settlement Agreement otherwise would deprive the Army of the benefit of the bargain it struck with the District: the Army was allowed to continue prescribed burns, in exchange for its promise to conform all burns to the exacting restrictions of the Settlement Agreement. Moreover, construing the Settlement Agreement as the District would deprives it of any real force, because even if the Army complies with its detailed provisions, it would (under the District's view) still face an uncertain risk of nuisance liability—a risk that complete-

---

**8.** Moreover, the District's subsequent conduct in approving prescribed burn days supports an interpretation of the contract that authorizes prescribed burns, even if, despite the Army's best efforts, they result in some disturbance to the surrounding community. *See Crestview Cemetery Ass'n v. Dieden,* 54 Cal.2d

744 754, 8 Cal.Rptr. 427, 356 P.2d 171 (1960) (observing that "actions speak louder than words" and holding that when "the parties to a contract perform under it and demonstrate by their conduct that they knew what they were talking about the courts should enforce that intent.").

ly undermines the Agreement's purpose of settling the dispute between the parties. *See* Cal. Civ.Code § 1652 (providing that repugnant clauses of contract must be subordinated to the general intent of the contract).

 The one instance where the Army did not comply with the exact terms of the Settlement Agreement occurred on September 18, 1998. That episode is described in the declaration of Ed Kending, the Manager of the District's Enforcement Division:

> On Friday September 18, 1998, I was present on Ft. Ord. During that time, I learned from a representative of the Army that since the fire from the previous day was still smoldering, the burn team wished to burn again that day. They stated that several public events were schedule for that weekend and they were concerned that if the fire reignited a wildfire might occur. The representative stated that under normal circumstances a standby crew would be available to extinguish reignitions however, the normal standby crew would not be available over the weekend. Should a reignition occur, the representative believed that smoke from the wildfire could have a negative impact on those events. I do not recall the representative making any statement regarding why the crew would not be working that weekend.

> I informed the representative that the meteorological conditions did not meet those required of the settlement agreement. I informed the representative that the District would take no position

on whether it was necessary or appropriate for the fire agency to conduct the burnout to prevent a wildfire. I stated that the decision as to whether they would burn in order to prevent a possible reignition was their decision. At no time did I recommend or concur in their decision.

(Kendig Decl. ¶¶ 2–3.) The Army argues that Kending waived the atmospheric depth conditions set forth in the Settlement Agreement by stating that "the District would take no position" on the necessity of the planned burned, and by telling the Army that the decision to burn "was their decision." While this argument is intuitively appealing, the court cannot rule as a matter of law that the conditions for waiver have been met. In particular, a waiver must be unconditional to be operative. *See Spellman v. Dixon,* 256 Cal. App.2d 1, 5, 63 Cal.Rptr. 668 (1967). Kendig's statements were too equivocal to be held unconditional as a matter of law. Moreover, a waiver cannot vitiate a material part of the bargain.[9] *See* John D. Calamari & Joseph M. Perillo, *The Law of Contracts* § 11–31 (3d ed.1987); 1 Witkin, *supra,* at § 767. The court cannot hold as a matter of law that the provisions of the Settlement Agreement regulating the conditions for atmospheric burns are immaterial, given the importance that both parties obviously attach to these conditions. Genuine issues of material fact therefore preclude summary judgment with regard to the September 18, 2000 burn.

Accordingly, the court holds that the Army's counter-motion for summary judgment should be granted with respect to the alleged breach of the Settlement Agree-

---

**9.** While a waiver cannot excuse a material condition of the contract, impossibility or impracticability will. *See* 1 Witkin, *supra,* at § 772–90 (discussing excuses of impossibility and impracticability). If the risk of uncontrolled fire mandated further prescribed burns—and if the risk was not created by the

Army's own negligence in conducting the previous day's burns—the Army may have a valid excuse for its nonperformance. The parties did not raise this issue in the papers, and, in any event, the factual nature of the inquiry may make this an ill-suited subject for summary judgment.

ment, with the exception of the September 18, 1998 burn. As to that burn, numerous issues of fact preclude a finding that it created a nuisance under California law.[10] The court therefore declines to grant summary judgment with respect to that particular event.

## C. THE DISTRICT'S PERMIT CLAIM

 The District moves for summary judgment that the Army violated the Federal Facility Agreement by conducting the prescribed burns without a permit.

CERCLA exempts remedial actions "conducted entirely onsite" from all federal, state, and local permit requirements. 42 U.S.C. § 9621(e)(1). All the burning activities are being "conducted" by the Army within the boundaries of Fort Ord— there are no fires being started offsite. The District does not dispute this, but argues that the release of smoke into the air means that the action is not being "conducted entirely onsite."

The District's argument lacks merit. (Indeed, it was rejected by this court previously when it denied injunctive relief in the 1997 action. *See* Army's Ex. D at 8.)

Under the District's logic, any remedial action that has consequences offsite is not "conducted entirely onsite." Taken to its extreme, the District's logic would hold that a remedial action that results in increased traffic from workers driving to the job site is not being conducted entirely onsite. This would render the exemption for onsite response actions a nullity. The case law offers no support for such an inclusive interpretation of the term "onsite." What little authority there is on the issue supports (if only indirectly) a much more specific construction of the term. *See Missouri v. Independent Petrochemical Corp.*, 104 F.3d 159, 162 (8th Cir.1997) (noting parties' agreement that a dioxin incinerator was exempt from local permit requirements); *United States v. Town of Moreau*, 751 F.Supp. 1044, 1046, 1048 (N.D.N.Y.1990) (holding without discussion that response that removed contaminants from water and released them into the air fell within exemption); *see also* 40 C.F.R. § 300.400(e)(1) ("The term 'on-site' means the areal extent of contamination and all suitable areas in very close proximity to the contamination necessary for implementation of the response action.").[11]

---

**10.** The District's evidence on this point consists of scientific evidence that particulate matter in smoke can cause deleterious health effects and its logs of complaints from members of the community. However, there remain factual issues concerning the balancing of conveniences (the utility of the Army's conduct compared to the gravity of the harm to community residents), as well as the extent of the hardship that has been caused. *See* 11 B.E. Witkin, *Summary of California Law* (Equity) §§ 123, 153.

At the same time, the Army's contention that its activities cannot be a nuisance because they are authorized by statute is also unpersuasive. The Army cites no particular statute specifically authorizing the use of prescribed burns to remove OE, which is required under the California cases.

**11.** The court also rejects the District's argument that the Federal Facility Agreement

makes the Army responsible for securing a permit even if it is otherwise exempt under Section § 9621(e)(1). The provision of the agreement cited by the District simply states: "this Section is not intended to relieve the Army from any and all regulatory requirements, including obtaining a permit, whenever it proposes a response action involving the movement of hazardous substances, pollutants, or contaminants off-site, or the conduct of a response action off-site." (FFA ¶ 19.2.) This language cannot fairly be construed to waive the Army's exemption under Section 9621(e)(1). Instead, it simply reaffirms the Army's responsibility for obtaining a permit when required by Section 9621, for example, if the Army were planning to transport unexploded ordnance through local communities on its way to a disposal site (assuming, of course, that the local communities otherwise had proper authority to require a permit for the movement of munitions).

The court therefore holds that the Army is entitled to the exemption of 42 U.S.C. § 9621(e)(1) and is not required to secure a permit for its prescribed burns. Accordingly, the District's motion for summary judgment that the Army unlawfully burned without a permit is denied.

## D. THE DISTRICT'S OTHER CLAIMS

The District's remaining claims—violations of CERCLA, the Clean Air Act, the California Health and Safety Code, the California Civil Code, and the District's own rules—depend entirely on the viability of the District's permit and nuisance claims. As set forth above, the permit claim fails as a matter of law, and the only viable nuisance claim relates to the one-time burn that occurred September 18, 2000. Thus, the Districts' motion for summary judgment on its remaining claims is denied.

## E. AVAILABILITY OF INJUNCTIVE RELIEF AND CIVIL PENALTIES

The District moves for summary judgment that it is entitled to injunctive relief for the Army's alleged breach of the Settlement Agreement. While the court agrees with the District that 42 U.S.C. § 9659(a)(1) authorizes injunctive relief against an ongoing remedial action, the District has failed to establish on this motion that the Army has violated the Settlement Agreement. Thus, the district is not entitled to an injunction through its summary judgment motion.

The District also moves for summary judgment that it is entitled to civil penalties from the Army for violations of the federal Clean Air Act and state and local clean air regulations. Again, the District has failed to establish through the summary judgment procedure that the Army has violated any statute authorizing the payment of fees. Thus, the court declines to reach the more difficult question of the United States' liability for such fees.

*Compare California v. United States,* 29 F.Supp.2d 652, 657 (E.D.Cal.1998) (holding that Congress has not waived the United States' sovereign immunity for civil air pollution penalties), *vacated for want of jurisdiction,* 215 F.3d 1005 (9th Cir.2000) *with United States v. Tennessee Air Pollution Control Board,* 185 F.3d 529, 533–34 (6th Cir.1999) (holding otherwise).

## IV. ORDER

For the foregoing reasons, the court grants the District's motion regarding jurisdiction and denies the Army's counter-motion, grants summary judgment in favor of the Army and against the District with respect to the Army's alleged breach of the parties' Settlement Agreement except as to the claims arising from the burn conducted on September 18, 1998 as to which there are genuine issues of material fact and denies the District's motion with respect to the other issues it raises.